David Lee YOHN, Petitioner,

v.

William J. LOVE and the Attorney General of the State of Pennsylvania and the District Attorney of Lehigh County, Respondents.

Civ. A. No. 94–524.

United States District Court,
E.D. Pennsylvania.

May 5, 1995.

Richard J. Makoul, Allentown, PA, for petitioner.

Michael P. McIntyre, Allentown, PA, for respondents.

I. Procedural History .................................................................. 777
II. Factual Background ................................................................. 779
 A. The Crime and Arrests .......................................................... 779
 B. The Tape and the Pre–Trial Motion to Suppress.................................. 779
 C. The Motion in Limine ........................................................... 779
 D. Trial ............................................................................ 780
 E. The Telephone Call.............................................................. 782
 F. The Aftermath .................................................................. 783
III. The Effect of the Telephone Conversation .......................................... 783
IV. The Habeas Petition ................................................................ 785
 A. Procedural Due Process.......................................................... 786
 1. Adequate Notice .......................................................... 787
 2. The Chance to be Heard .................................................. 788
 3. A Court Having Jurisdiction ............................................... 788
 4. The Commonwealth's Argument ........................................... 790
 B. Harmless Error ................................................................. 791
 1. The Burden of Pleading ................................................... 792
 2. The Burden of Proof ...................................................... 792

 3. The Standard for Assessing Harmlessness ................................... 794
 4. Application of the Standard ............................................. 796
 C. The Remedy ......................................................... 797
V. Conclusion ............................................................. 798

---

## MEMORANDUM

NEWCOMER, District Judge.

Presently before the Court is David Lee Yohn's Petition for Writ of Habeas Corpus, the Answer of Respondents thereto,[1] the Report and Recommendation of United States Magistrate Judge Charles B. Smith, Respondent's Objections thereto, and the record of the proceedings against Petitioner in the state courts of Pennsylvania. For the reasons that follow, the Report and Recommendation will be approved, and the Petition for Writ of Habeas Corpus will be granted.

### I. Procedural History

On November 5, 1985, a jury convicted petitioner David Lee Yohn of second degree murder, robbery, conspiracy, and related charges after a trial before the Honorable James N. Diefenderfer of the Lehigh County Court of Common Pleas. Yohn filed timely post-trial motions in arrest of judgment and for a new trial raising numerous claims, including the allegation that Pennsylvania Supreme Court Chief Justice Robert N.C. Nix improperly intervened in the trial and caused Judge Diefenderfer to reverse his decision to exclude a tape recording.[2] These motions were denied on November 3, 1986 by an en banc panel of the Court of Common Pleas.[3]

On June 13, 1988 Yohn was sentenced to life imprisonment on the second degree murder conviction and included offenses and a consecutive term aggregating five to ten years for the non-merged offenses.

Yohn appealed his conviction directly to the Superior Court of Pennsylvania, which affirmed the judgment of the Court of Common Pleas on June 22, 1989. In this appeal, Yohn again raised his claim concerning the improper intervention of Chief Justice Nix. The Superior Court specifically declined to address this issue.[4]

On July 14, 1989 Yohn petitioned the Pennsylvania Supreme Court for allocatur, again raising the intervention of Chief Justice Nix as grounds for reversal. At the same time, Yohn moved for recusal of Chief Justice Nix. On February 19, 1993 the Pennsylvania Supreme Court issued a per curiam order denying the petition for allowance of appeal.

On January 26, 1994 Yohn filed the instant Petition under 28 U.S.C. § 2254, raising two grounds:

1. In violation of the 5th, 6th and 14th Amendment guarantees to a fair and impartial trial, Chief Justice Nix improperly and without jurisdiction interfered in Yohn's trial by conducting an ex parte

---

1. The Respondents did not file a Memorandum of Law with their Answer. Nearly three months after the Answer was filed, the Respondents sent to Magistrate Judge Smith, via facsimile, a portion of a brief filed by the Commonwealth during Petitioner's state court proceedings. The brief is not identified, but appears to have been filed in opposition to Petitioner's post-trial motions, his appeal to the Superior Court of Pennsylvania or his allocatur petition to the Pennsylvania Supreme Court. The Respondents also provided the corresponding portion of Petitioner's state court brief. The Respondents did not send a copy of these submissions to the Clerk of Court so that they could be filed of record. The submissions were, however, considered by Magistrate Judge Smith, and thus should be viewed as part of the record before this Court. Therefore, an Order directing the Clerk of Court to file these documents of record nunc pro tunc will be filed together with this Memorandum and Order.

2. This allegation forms the basis of the instant Petition, and will be discussed infra. The en banc panel did not address this issue, other than to note that Judge Diefenderfer's decision to admit the tape recordings came after a telephone conversation with Chief Justice Nix. Commonwealth v. Yohn, No. 659 of 1985, slip op. at 7, n. 8 (Lehigh County Court of Common Pleas Nov. 3, 1986).

3. The en banc panel consisted of President Judge John E. Backenstoe and Judge Diefenderfer. The opinion denying the motions was authored by Judge Backenstoe.

4. "[T]his court is without jurisdiction to determine the propriety of any action taken by our Supreme Court." Commonwealth v. Yohn, No. 01907 Philadelphia 1988, slip op. at 14, 392 Pa.Super. 656, 564 A.2d 265 (Pa.Super. June 22, 1989) (citing 42 Pa.C.S.A. §§ 741, 742).

telephone conversation with the trial judge that caused the trial judge to reverse involuntarily his decision to preclude admission of a tape recording;[5] and

2. In violation of constitutional due process and equal protection guarantees, Chief Justice Nix interfered in Yohn's allocatur petition by reversing his original decision to recuse himself and influencing the justices of the Supreme Court to deny the petition.[6]

5. This claim was properly raised to the highest court of Pennsylvania, satisfying the federal habeas corpus exhaustion requirement and permitting this Court to address its merits.

6. This claim was not raised prior to its inclusion in the Petition for Writ of Habeas Corpus. This issue was unknown to Yohn until, during a grand jury investigation of Justice Rolf Larsen, Justice Larsen accused Justices Zappala and Cappy of improprieties regarding the handling of Yohn's allocatur petition. The grand jury ultimately concluded that there was no wrongdoing on the part of the two accused justices. The grand jury's report does, however, contain several disturbing findings. For example, the report reveals that Chief Justice Nix initially elected not to participate in the Supreme Court's consideration of Yohn's petition, but later injected himself into the deliberations to respond to comments made by Justice Larsen in a draft opinion. Also, the grand jury found that Chief Justice Nix, for reasons that the grand jury did not discover, circumvented the usual assignment procedures of the Supreme Court to assign responsibility for the petition to Justice Flaherty. This reassignment came after Chief Justice Nix had purportedly recused himself. Moreover, at one point four justices (a necessary majority) had agreed that a *per curiam* order should issue granting Yohn a new trial. This would have been an extraordinary result, as the new trial would have been granted without the grant of allocatur and without the requirements of briefing or oral argument. Justice Larsen was dissatisfied with this result and drafted a concurring opinion that was harshly critical of Chief Justice Nix's interference in Yohn's trial. Justice Larsen had been censured for interfering in a pending case in Allegheny County, felt that the Chief Justice should receive similar scrutiny, and believed that the lack of action against the Chief Justice was evidence of a double standard. Justice Larsen did agree that Yohn was entitled to a new trial. It was this opinion that prompted Chief Justice Nix's re-entry into the consideration of the allocatur petition. At this point, several holds were placed on the petition, in large part to avoid the embarrassment of airing the internal disputes of the Supreme Court publicly (some of the delay

Magistrate Judge Smith addressed only the first of these claims in his Report and Recommendation issued on February 7, 1995, concluding that resolution of this claim rendered consideration of the second moot.[7] Magistrate Judge Smith recommended that this Court grant the petition and order Yohn released from custody unless the Commonwealth affords him a new trial within 120 days. The Commonwealth filed timely objections to the Report and Recommendation.

was attributable to the fact that the Supreme Court was considering cases that it believed to be related to Yohn's case in that they dealt with the right of the Commonwealth to appeal adverse rulings during criminal trials). During this delay, minds changed, and a *per curiam* order denying the allocatur petition was issued some three and one half years after the petition was filed.

The grand jury's investigation focused on Justice Larsen and his allegations against Justices Zappala and Cappy. It did not concern itself with the actions of Chief Justice Nix, except to the extent that they were relevant to the investigation. Thus, to date, the propriety of the Chief Justice's actions with regard to Yohn's allocatur petition has not been considered by any investigative or judicial authority. The instant Petition, as will be explained *infra*, does not require this Court to pass judgment upon the handling of Yohn's allocatur petition. The fact that this issue is not reached herein, however, is not tantamount to a finding that Chief Justice Nix's conduct was blameless or appropriate.

7. This Court will approve Magistrate Judge Smith's recommendation regarding Petitioner's first claim, and will similarly decline to reach the second. Though this Court will not address the constitutional issues raised in connection with the allocatur petition, it must note that the Supreme Court's handling of the petition was, at the very least, unprincipled. Though at some point at least five justices believed that Yohn was entitled to a new trial, the Supreme Court permitted internal squabbling and concern for its own reputation to take precedence over the rights of the Petitioner. The Supreme Court utterly failed in this instance to fulfill its mission to zealously and vigilantly guard the rights of the citizens of Pennsylvania, choosing instead to advance its own interests at the expense of those it is entrusted to protect. The ramifications of such conduct extend beyond the obvious prejudice to a single petitioner, for, in the words of Justice Thurgood Marshall, "We must never forget that the only real source of power that we as judges can tap is the respect of the people."

## II. *Factual Background*

### A. The Crime and Arrests

At approximately 11:40 p.m. on January 23, 1985 in Old Zionsville, Lehigh County, Pennsylvania, Andrew Kollar was killed outside his home, a victim of one shotgun blast to the back. Pennsylvania State Police learned that Kollar was a drug dealer and bookmaker known to keep large quantities of drugs and cash in his home and surmised that he was the subject of a failed robbery attempt. Jerry Southerland was reputedly involved in illicit transactions with Kollar, and rumors about his involvement in the murder started to circulate. Police suspicion began to focus on Southerland.

On March 10, 1985 police questioned Southerland, who deneid any knowledge of or participation in the killing. Some time later, however, Southerland changed his story and, accompanied by his lawyer, met with authorities in hopes of negotiating a deal. Law enforcement officials and Southerland reached an agreement that required Southerland to cooperate with the prosecution of others allegedly involved in the crime. In exchange, Southerland would be charged only with one count of burglary, rather than murder, and would be allowed to remain free on his own recognizance. The deal was contingent on the accuracy of Southerland's self-described role in the crime as simply the "wheelman."

Pursuant to his agreement, Southerland gave authorities a statement implicating Yohn and Donald Lynn in the failed robbery; he identified Yohn as the one who fired the fatal shotgun blast. Southerland then agreed to wear a body wire and meet with Yohn to attempt to elicit incriminating statements from him. On March 15, 1985, pursuant to Pennsylvania wiretapping law, 18 Pa. C.S.A. § 5708, *et seq.*, police wired Southerland with a transmitter. A reel-to-reel tape recorder was to serve as the primary device for recording any conversations between Southerland and Yohn. In the van was a receiver for the transmitter with an attached recorder that was to serve as a back up to the reel-to-reel recorder while also permitting the police to overhear the conversation as it took place.

With the transmitter in place, Southerland met with Yohn and had discussions with him in a bar, in Southerland's car, and outside the car in an isolated area. The State Police were monitoring the conversations from a van containing receiving and recording equipment. The van was following Southerland's car throughout his meeting with Yohn. The reel-to-reel recorder failed to capture any of the conversation, and the transmitter fared little better, recording only fragments.

Later that day, police arrested Yohn and Lynn on charges of murder, robbery, burglary, criminal trespass, crimes committed with firearms, and criminal conspiracy. Immediately after his arrest, and without counsel present, Lynn gave a statement implicating himself, Southerland and Yohn. Three days later, on March 18, 1985, Lynn amended the statement to add that, shortly after hearing the shot that killed Kollar, he had observed Yohn holding a shotgun. Eventually, Lynn reached an agreement with the prosecution under which, in exchange for his testimony at trial, he was permitted to enter pleas of guilty to charges of third degree murder and attempted burglary. Yohn elected to proceed to trial.

### B. The Tape and the Pre–Trial Motion to Suppress

As noted above, portions of the conversation between Yohn and Southerland made their way onto the tape in the recorder attached to the transmitter. The tape was approximately thirty minutes in length. A fragment comprising about two minutes of this was partially audible. Yohn filed a motion to suppress the tape recording on constitutional and procedural grounds. Judge David E. Mellenberg denied the motion in an opinion and order filed on September 10, 1985.

### C. The Motion in Limine

On October 21, 1985, immediately prior to *voir dire,* Yohn moved *in limine* for an order excluding the tape recording, or, alternatively, precluding the prosecution from referring to the tape until a ruling on its admissibility had been made. The court held an *in cam-*

*era* hearing, with the judge sitting in the jury box while reading a transcript of the tape prepared by a secretary in the District Attorney's office. The court stenographer attempted to transcribe the tape.[8] Yohn argued that the tape was inaudible and untrustworthy, and would cause the jury to engage in prejudicial speculation. The court reserved its ruling until the following morning, when it would have the opportunity to review the stenographer's transcript.

On October 22, 1985 the court overruled the defense objection to the tape in chambers, stating "[w]e will let [the tape] go in, but I'm not satisfied with the transcript." On October 23, 1985 Yohn argued that the ruling regarding the tape was unclear, and, further, that if the court had made a ruling on the admissibility of the tape it was obligated to make findings of fact on the record, as required by Pennsylvania law.[9] The judge stated that he agreed "that there is more to be resolved in respect to the tape." He further stated that he would permit the prosecution to refer to the tape during *voir dire,* and that the issue would be taken up again after a jury was selected. The prosecution referred to the existence of recorded conversations during the questioning of prospective jurors.

### D. Trial

Trial commenced without any further discussions of or rulings on the admissibility of the tape recording. In its opening statement, the prosecution devoted a considerable amount of time to an explanation of the tape recording, how it was made and what it

would be used to prove. The defense also devoted a portion of its opening statement to the tape recording, advising the jury that, if it was permitted to hear the tape, it would discover that nearly all of the recorded conversation was inaudible.

When the Commonwealth attempted to introduce evidence based on the tape at trial, Judge Diefenderfer halted the trial and ordered another *in camera* hearing so that he could again consider the admissibility of the recording. The Assistant District Attorney expressed his belief that a ruling on admissibility had already been made, and that the only outstanding issue was the preparation of a transcript. To this, Judge Diefenderfer replied:

> the transcript bothers me very much and initially, given the question to decide, I agree I may have made a preliminary ruling. But it has always bothered me and I think I should give it a more thorough consideration. I have real problems with it to be honest with you as to whether this new transcription is going to help.[10]

Using more sophisticated audio equipment than during the hearing on the initial motion *in limine,* the Commonwealth again played the tape while Judge Diefenderfer sat in the jury box with the court stenographer. The thirty minute tape was played in its entirety first, and Judge Diefenderfer did not have a transcript. Next, the two minute segment that the Commonwealth proposed to introduce was replayed while the judge read the transcript prepared by the Assistant District Attorney.[11]

---

**8.** The transcription reads as follows:
 What the fuck ... I don't know ... out of town and he said ... going with me ... on together ... shoot all kinds of cocaine and stuff like this ... who his shooting partners were ... that's how it came down ... Saturday and again yesterday ... everything is taken care of ... fucking bullshit ... something about .45 ... I know he had enough money ... shotgun ... for hunting ... okay ... human ... blow out of here ... don't know ... I hope not.

**9.** Admission of tape recordings in Pennsylvania criminal cases is governed by *Commonwealth v. Leveille,* 289 Pa.Super. 248, 433 A.2d 50 (1981). *Leveille* held that the decision on admissibility of tape recordings is left to the discretion of the trial judge, "who necessarily [is] in a superior

position to determine the audibility of [a] tape and its trustworthiness as evidence." 433 A.2d at 52. This case will be revisited *infra.*

**10.** The new transcription was prepared by the Assistant District Attorney.

**11.** The stenographer's transcription of this segment of the tape reads:
 hear me ... can you hear me now ... I did something different ... I'm going to try ... and go out that way ... not really ... post office ... toward Coplay ... a Michelob ... questioning ... that's it ... come in asks questions ... what's going on, what's going on ... homicide ... you know ... I thought I saw ... I came in ... they ... I don't know ... I don't

After hearing arguments from counsel, the judge issued a ruling. He found that the tape was inaudible when listened to without the benefit of the transcript, and that it was not possible to identify the speakers. He further found that the transcript did not add significantly to the process of understanding the tape. He stated that, even with the benefit of the transcript, the jury would be forced to speculate as to what was being said on tape. On the basis of these findings, Judge Diefenderfer granted the defense motion to exclude the tape.

When the trial resumed after this ruling, the Commonwealth called Pennsylvania State Police Officer Robert Gerken to the stand. Officer Gerken had been in the van containing the recording equipment that produced the tape in question. He had listened to the conversation as it was being recorded, and had taken notes. The Commonwealth made an offer of proof that Officer Gerken would testify as to what he heard of the conversation and would offer his notes as a transcript. The defense objected to such testimony, arguing that Officer Gerken's testimony could be no more reliable than the tape recording because he had listened to the conversation through the recording equipment. Judge Diefenderfer sustained the objection, ruling that the testimony would have "the same prejudicial effect" as the tape. This argument and ruling took place at a sidebar conference.

At this point, while still at sidebar, the Assistant District Attorney requested a continuance, stating that he would seek a Writ of Prohibition from the Pennsylvania Supreme Court. The request for a continuance was denied, and the court instructed the parties to proceed. In open court, the Assistant District Attorney then requested a fifteen minute recess. Judge Diefenderfer called counsel back to sidebar, where the Assistant District Attorney launched into a tirade, prompting the judge to grant the requested recess.[12]

When the recess was concluded, the Assistant District Attorney informed Judge Diefenderfer at sidebar that he had placed a call to Chief Justice Nix's chambers and reached a law clerk. The law clerk advised the Assistant District Attorney that Chief Justice Nix was in conference, but would attempt to contact the trial judge when the conference was concluded. The Assistant District Attorney

---

know ... six pack, please ... Michelob, please ... over the phone ... I never ... the fuck ... I don't know ... get the fuck out of here ... I'm going to be the fuck out of town ... and he said that ... gone with me ... he said ... together ... try to ... shooting all kinds of cocaine and stuff like that ... ask him who the shooting partners were ... that's where he fucking gets ... I talked to Donny then ... anybody ... and that's how it came down ... as far as I know it's Saturday and again yesterday ... I did not give him your name at all ... nothing about nothing ... everything is taken care of ... we got rid of all the fucking bullshit ... what about ... something about a .45 ... you got rid of ... you didn't fuck around and keep it ... a lot of money ... you ... shotgun ... hunting ... you sure ... okay ... human ... look man ... I don't know ... took me right up ... fucking ... you hang tight ... and know nothing ... back to Donny ... at all ... I hope not ... he will fucking run his mouth.

**12.** The sidebar discussion between the court, Assistant District Attorney McIntyre and defense counsel Mr. Makoul follows, in pertinent part:

THE COURT: This is the trial ruling and let's go.
MR. McINTYRE: We are asking for a recess.
THE COURT: So you are.

MR. McINTYRE: You have to hold me in contempt because I will get a Writ of Prohibition filed right now.
THE COURT: I'm not going to hold you in contempt.
MR. McINTYRE: You have to. I'm getting a Writ of Prohibition.
THE COURT: Don't get so excited. We have a trial ruling.
MR. McINTYRE: You lose most.
THE COURT: What?
MR. McINTYRE: You heard me.
THE COURT: What?
MR. McINTYRE: I said you lose them most.
THE COURT: I stand on my trial ruling on this, Mr. McIntyre.
MR. McINTYRE: I'm asking for a recess. I think we should be allowed the opportunity to have a recess. I want to talk to Bill Platt [his supervisor] and decide what we are going to do. Sometimes you [sic] just can't take what you have done to us in this case.
THE COURT: Mr. McIntyre, don't talk so silly. That tape was an absolute absurdity.

\* \* \* \* \* \*

THE COURT: ... I think you are overreacting, Mr. McIntyre ... The tape was absolutely prejudicial.
MR. McINTYRE: Later on I'll tell you what I think of you in this case.

requested a continuance until he was able to speak with the Chief Justice. The request was denied. A Commonwealth request for an instruction to the jury regarding the exclusion of the tape was granted. The judge instructed the jury that he had ordered the tape excluded after originally ruling that it was admissible, and that the jurors were not to believe that the Commonwealth intended to mislead them by referring to the tape in opening statements.

The Commonwealth put one additional witness on the stand and rested its case. At the close of the prosecution's case, the jury was temporarily excused while objections to the Commonwealth's exhibits were argued. The Assistant District Attorney sought a recess for purposes of obtaining a stay from Chief Justice Nix. The judge denied the request, stating "I would not think Chief Justice Nix will be concerned about trial rulings at this point." The Assistant District Attorney retorted "[e]xcuse me, your honor, but I respectfully must tell you I'm not too concerned with what you think. That's why we have to go to the Supreme Court in the first place."

The defense opened its case by presenting Connie Yohn, petitioner's wife, as a witness. Her testimony was interrupted when a call was placed to Judge Diefenderfer's chambers by Chief Justice Nix. The trial was recessed so that Judge Diefenderfer could speak with the Chief Justice.

### E. The Telephone Call

The trial judge, the Assistant District Attorney, and defense counsel proceeded to the trial judge's chambers.[13] Judge Diefenderfer and the Assistant District Attorney spoke with Chief Justice Nix on the only two available telephones. Counsel for Yohn did not participate in the conversation. While it does not appear that defense counsel was ever invited to speak with the Chief Justice, it does not seem that he ever requested to do so or was refused permission to do so.

Chief Justice Nix asked the Assistant District Attorney to relate what had prompted the call placed to his chambers. The Assis-

tant District Attorney explained the background regarding the exclusion of the tape, and Judge Diefenderfer agreed that the facts as set forth by the Assistant District Attorney were essentially correct. The tape was not played for the Chief Justice. At this point, Chief Justice Nix began speaking to the trial judge. Exactly what was said by the Chief Justice is disputed, as will be explained below.

When trial resumed, Judge Diefenderfer stated on the record at a sidebar conference "that [at] approximately 20 of 12:00 I received a call from Chief Justice Nix relative to this case who said to me that regardless of my ruling in respect to the tape that I should defer that ruling and frame the issue and allow the tape to be played. This I'm sure was a directive from him which the court will abide by." Defense counsel objected, arguing that he had never been apprised of exactly what transpired with regard to Chief Justice Nix's intervention. The Assistant District Attorney related his actions for the record. He said "I gave [the law clerk] my version of the fact that we had a pre-trial ruling which permitted me to use the tape and transcript, that I relied on that in giving an opening statement. After my opening statement the judge changed his mind, the way I look at it." He continued to explain that he wanted the Chief Justice to issue a stay of the proceedings so that a request for a Writ of Prohibition could be filed.

Judge Diefenderfer stated that he did not change his ruling on the tape, but that he had "been directed by the Chief Justice to let it in." Discussion of the telephone call was completed with defense counsel stating that he understood the trial judge to be "in disagreement with the admissibility of the tape but feels [he] is under a directive of Chief Justice Nix," to which the judge replied "[c]orrect." Defense counsel then requested a stay for purposes of seeking review of Justice Nix's order by the full Supreme Court; the request was denied. The Commonwealth was permitted to reopen its case, and the tape was admitted.

---

**13.** The proceedings in chambers were not made part of the record.

As noted above, there is disagreement as to what Chief Justice Nix actually said to Judge Diefenderfer over the telephone. Yohn argues that Chief Justice Nix ordered the admission of the tape. This version is supported by the statements made by Judge Diefenderfer on the record.

The Commonwealth argues that Chief Justice Nix merely advised the trial judge that it would be best to admit the tape for two reasons: first, because the tape had originally been ruled admissible and second, because the Commonwealth would be unable to appeal exclusion of the tape whereas Yohn could appeal its admission if he were convicted. This advice, it is argued, was offered spontaneously by the Chief Justice, and not pursuant to any request of the Assistant District Attorney or the trial judge. The Commonwealth further asserts that the Chief Justice suggested that the issue of admissibility could be considered again on post-trial motions. This advice was offered by the Chief Justice, in the opinion of the Commonwealth, merely to avoid the procedural difficulties that would have arisen if a stay was issued, a petition for a Writ of Prohibition filed and the petition considered by the entire Supreme Court.

Chief Justice Nix spoke of the telephone conversation in an interview he gave during the grand jury proceedings against Justice Larsen that are referred to in footnote 6 of this Memorandum. He stated that he viewed the relevant issue to be the propriety of the trial court's reversal of its own initial ruling to admit the tape.[14] He believed that if the tape were admitted and the defendant convicted, the issue of the tape's admissibility would be framed for appeal. Chief Justice Nix further stated that it was unnecessary for him to order admission of the tape, as Judge Diefenderfer voluntarily agreed to its admission. Judge Diefenderfer was also interviewed for the grand jury. He informed the grand jury that he did not recall Chief Justice Nix stating that the relevant issue was the trial court's reversal of its initial

ruling. Judge Diefenderfer explained that, as a result of the conversation with the Chief Justice, he felt compelled to admit the tape recording at trial.

F. The Aftermath

Yohn was acquitted of charges of first and third degree murder, and convicted of second degree murder, two counts of robbery, burglary, criminal trespass, crimes committed with firearms and criminal conspiracy. He sought a new trial, complaining of Chief Justice Nix's intrusion into his trial. This contention was effectively ignored by the *en banc* panel that entertained his post-trial motions. The panel concluded only that the trial judge did not abuse his discretion by, "after considerable deliberation," admitting the tape recording. *Commonwealth v. Yohn,* No. 69 of 1985, slip op. at 7 (Lehigh County Court of Common Pleas Nov. 3, 1986). Yohn was sentenced to life in prison to be followed by an additional term of five to ten years. As noted previously, the Pennsylvania Superior Court and the Pennsylvania Supreme Court also refused to hear Yohn's claim regarding the Chief Justice. Yohn then turned to the federal courts to seek relief.

III. *The Effect of the Telephone Conversation*

As noted previously, there is considerable disagreement as to the exact content of the telephone conversation between Chief Justice Nix and Judge Diefenderfer. It has been characterized by the Commonwealth as merely advice, and by the petitioner as a directive. The actual substance of the conversation, however, is largely irrelevant here. The significance of the conversation lies in its effect on petitioner's trial, and this effect is clear from the record.

The Commonwealth asserts that the telephone call was placed to Chief Justice Nix's chambers in an effort to obtain a stay of the proceedings to permit the Commonwealth to file a petition for a Writ of Prohibition. The

---

**14.** According to an opinion drafted by the Chief Justice relating to Yohn's petition for allocatur, he believed that the Commonwealth acted properly in attempting to secure a Writ of Prohibition, and that he advised Judge Diefenderfer on the telephone that he was prepared to recommend to the full Supreme Court that it stay the trial and consider the issue of the trial court's reversal of its decision.

trial transcript does reflect that the Assistant District Attorney did seek a recess on several occasions while stating his intention to petition the Supreme Court for a stay. Additionally, the record indicates that the Assistant District Attorney informed Chief Justice Nix's law clerk during the initial telephone call that the Commonwealth was requesting a stay.

Equally clear, however, is that the telephone conversation between Chief Justice Nix, Judge Diefenderfer and the Assistant District Attorney encompassed much more than a discussion of the imposition of a stay.[15] Chief Justice Nix addressed the merits of Judge Diefenderfer's decision to exclude the tape. It is obvious that something he said caused Judge Diefenderfer to believe that the ruling excluding the tape was being reversed. At the time of the telephone call, the Chief Justice had no facts before him, other than the brief recitation provided by the Assistant District Attorney. The Chief Justice had not heard the tape recording in question. This Court cannot speculate as to why the trial judge, the Assistant District Attorney and Chief Justice Nix chose to advance the discussion beyond the simple issue of whether a stay should issue to address the more complex issue of the tape's admissibility.[16] The simple fact is they did, and the effect of this discussion on the Petitioner's trial, not the actual content of the discussion, is the pertinent issue.

Judge Diefenderfer was clearly troubled by the question of the tape's admissibility from the time the issue was first presented to him in Yohn's motion *in limine*. Initially,

he did rule that the tape could be admitted. In issuing this ruling, however, he expressed his grave concerns as to the audibility of the recording. Eventually, after listening to the tape more than once and hearing arguments of counsel, Judge Diefenderfer made a second ruling, declaring that because portions of the tape were so inaudible and omissions so substantial as to render the tape unreliable and prejudicial, he would exclude the tape from evidence. He then instructed the jury that the decision to exclude the tape was made after an initial ruling allowing its admission, and that, therefore, the jury was not to infer that the Commonwealth's prior references to the tape were intended in any way to be misleading or deceptive. At this point the telephone call from Chief Justice Nix was received.

■ Upon returning to the courtroom after speaking with Chief Justice Nix, Judge Diefenderfer stated at sidebar that he received a directive from the Chief Justice to admit the tape recording. He further stated that he was not changing his ruling on the tape's admissibility, but rather had been "directed by the Chief Justice to let it in." After an inquiry by defense counsel, Judge Diefenderfer confirmed that he was allowing the tape to be played because of the directive he had received despite the fact that he did not find the tape admissible. All of this makes the actual content of the telephone call relatively unimportant. Judge Diefenderfer permitted the tape recording to be played to the jury only because he concluded that he had been directed to do so by the Chief Justice of the State Supreme Court.[17]

15. In fact, a review of the record leads to the conclusion that, in all probability, the issuance of a stay was not seriously discussed.

16. This Court will not address the issue of whether the procedure followed would have violated Petitioner's rights if the discussion had been limited to issuance of a stay. The Court does note, however, that it appears to be extremely irregular for the chief jurist of a state to have direct discussions regarding an ongoing trial with the trial judge.

17. Judge Diefenderfer never placed on the record any doubts regarding either the jurisdiction of Chief Justice Nix to issue such an order or the propriety of his actions. It is a fact almost too

obvious to need stating that a single judge of a higher court (even the chief jurist of a state), acting on an incomplete if not non-existent record, is not empowered to order a trial judge to admit a piece of evidence in a pending trial. This Court cannot understand why Judge Diefenderfer did not at least raise a question as to the limits of Chief Justice Nix's authority. Nor can this Court understand why Chief Justice Nix did not hesitate to intervene in the situation or why the Assistant District Attorney did not attempt to limit the discussion to the issuance of a stay once the merits of the underlying issue were raised. These questions cannot, and need not, be answered here. Perhaps this procedure was not questioned because it is not uncommon practice. It is not the function of this Court to conduct a

He never changed his own position on the admissibility of the tape recording. As a practical matter, the ruling of Judge Diefenderfer had been summarily reversed by a higher court.

■ Though implicitly rejected above, the Commonwealth's argument regarding the significance of the telephone conversation's contents will be addressed briefly. The Commonwealth's version of the facts comes from the Assistant District Attorney's recollection of the nature of the telephone conversation. In this version no directive ever came from Chief Justice Nix. Rather, the Chief Justice merely offered his advice to Judge Diefenderfer in an attempt to resolve the conflict while avoiding the procedural morass attendant to the filing of a petition for a Writ of Prohibition.[18] Accordingly, the trial judge was fully able to exercise his discretion in deciding whether to accept the advice offered, and was thus not forced to admit the tape. The Commonwealth asserts that the fact that Judge Diefenderfer may have misinterpreted the comments of Chief Justice Nix to be an order rather than advice should be without effect as the trial judge was free to make his own decision, even if he did not realize it. The Commonwealth's argument is flawed in a critical regard. It places the emphasis on the wrong party. It is not Chief Justice Nix's intent that is relevant, it is Judge Diefenderfer's perception of this intent. Had Judge Diefenderfer not construed the comments of the Chief Justice to constitute an order, the tape would not have been admitted. This inescapable conclusion is the crux of the issue presented in the instant Petition.

comprehensive review of the manner in which criminal cases are handled in the state courts of Pennsylvania. If this case is an example of a standard (or even occasional) practice, however, there is little doubt that such a review is warranted.

18. The Commonwealth asserts, without specific examples, that "situations are legion in which judges ... of different jurisdictions contact each other for advice." This Court finds such a statement difficult to accept. It would be improper for a trial judge to seek advice about a specific issue in a pending case from a judge who might

There is another issue presented by the telephone call from Chief Justice Nix that must be addressed. The available equipment in the trial judge's chambers prevented all parties from participating in the conversation simultaneously. Counsel for defendant did not participate in the conversation, nor did he hear Chief Justice Nix's portion of the call. Therefore, the discussion between the Chief Justice, Judge Diefenderfer and the Assistant District Attorney was effectively *ex parte*. The fact that defense counsel was present in the room during the call and was not explicitly barred from speaking does not cure this defect.

IV. *The Habeas Petition*

■ Having discussed the factual and procedural background of this case, this Court can now turn to the federal constitutional issues raised by the instant Petition. The United States Constitution guarantees state court criminal defendants the right to a fair trial, in part through the Due Process Clause of the Fourteenth Amendment. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (Due Process Clause guarantees the right to a fair trial, Sixth Amendment defines basic elements of a fair trial). The Fourteenth Amendment due process construct is twofold, composed of both procedural and substantive requirements. *Rogers v. Richmond*, 365 U.S. 534, 544–45, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). Magistrate Judge Smith found both procedural and substantive due process violations in this case. This Court finds that analysis of the procedural due process issue is dispositive of the instant Petition, and consequently, deems it unnecessary to address the substantive due process issues

later be called upon to consider that same issue on appeal. *See In re Cunningham*, 57 N.Y.2d 270, 456 N.Y.S.2d 36, 442 N.E.2d 434 (1982). There is a heightened danger of impropriety in cases such as this, where the discussion centers not on a point of law but an area calling for the exercise of the lower court's discretion. It is all too possible that the "advice" of the appellate judge will interfere with the independent exercise of discretion by the trial court. The Commonwealth's statement, if accurate, paints a frightening portrait of the Pennsylvania state court system.

raised by the Petition.[19] This Court's procedural due process analysis will be discussed in 'detail below.

■ The writ of habeas corpus is, historically, an extraordinary remedy, "a bulwark against convictions that violate 'fundamental fairness.'" *Engle v. Isaac,* 456 U.S. 107, 126, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783 (1982) (quoting *Wainwright v. Sykes,* 433 U.S. 72, 97, 97 S.Ct. 2497, 2512, 53 L.Ed.2d 594 (1977) (Stevens, J. concurring)). "Those few who are ultimately successful [in challenging a conviction through a petition for writ of habeas corpus] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia,* 372 U.S. 391, 440–41, 83 S.Ct. 822, 850, 9 L.Ed.2d 837 (1963). As the writ of habeas corpus is such an extraordinary remedy, it is not granted in all cases where a constitutional violation is found.[20]

■ Some constitutional violations affect rights so fundamental that by their very nature they cast sufficient doubt on the fairness of a trial as to be *per se* prejudicial, automatically invalidating a conviction. *Arizona v. Fulminante,* 499 U.S. 279, 309–11, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); *Satterwhite v. Texas,* 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988).[21] Most constitutional violations, however, are subjected to harmless error analysis. *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1727, 123 L.Ed.2d 353 (1993) (White, J., dissenting).[22] Following the discussion of the procedural due process violation in this case, this Court will analyze the question of whether Yohn is entitled to the grant of the writ.

A. Procedural Due Process

■ A criminal defendant has the right to be tried in accordance with the procedural due process requirements of the Fourteenth Amendment to the United States Constitution. *Rogers,* 365 U.S. at 544–45, 81 S.Ct. at 741–42. "Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law." *McKeiver v. Pennsylvania,* 403 U.S. 528, 531, 91 S.Ct. 1976, 1979, 29 L.Ed.2d 647 (1971). "Whatever disagreement there may be as to the scope of the phrase 'due process of law' there can be no doubt that it embraces the fundamental conception of a fair trial." *Frank v. Mangum,* 237 U.S. 309, 347, 35 S.Ct. 582, 595, 59 L.Ed. 969 (1915). Though the limits of procedural due process

---

**19.** Magistrate Judge Smith found the occurrences in this case to "shock the conscience of [the] court." The fact that this Court is declining to address the substantive due process issues in this case should not be seen as an indication that this Court is any less shocked than Magistrate Judge Smith by the interference of Chief Justice Nix in Petitioner's trial.

**20.** The reasons for the restraint exercised by the federal courts in granting habeas petitions are many. The states have a recognized interest in the finality of convictions that have survived direct review within the state court system. *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353, 371 (1993). Principles of comity and federalism are also given consideration. "The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power and their good-faith attempts to honor constitutional rights." *Engle,* 456 U.S. at 128, 102 S.Ct. at 1572. Additionally, liberal granting of the writ would undermine the prominence of the criminal trial. *Id.* at 127, 102 S.Ct. at 1571.

Finally, frequent grants of the writ would unduly encourage petitioners to relitigate their claims on collateral review. *Rose v. Lundy,* 455 U.S. 509, 547, 102 S.Ct. 1198, 1218, 71·L.Ed.2d 379 (1982) (Stevens, J., dissenting).

**21.** Other errors may require automatic invalidation of a conviction not because of the fundamentality of the right that was violated, but because prejudice is so likely to occur but so difficult to prove. *Riggins v. Nevada,* 504 U.S. 127, 136–40, 112 S.Ct. 1810, 1816–17, 118 L.Ed.2d 479 (1992) (defendant forced to take antipsychotic medication during trial in derogation of constitutional rights); *Holloway v. Arkansas,* 435 U.S. 475, 489–91, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978) (single attorney jointly represented defendants with conflicting interests). As will be discussed in detail *infra,* the effect of the constitutional violation on Yohn's trial can readily be determined, making unnecessary consideration of the instant Petition under this category of automatically reversible convictions.

**22.** *Brecht* appears to have created an exception to the rule requiring harmless error analysis in cases of egregious error. —— U.S. at —— n. 9, 113 S.Ct. at 1722 n. 9.

may not always be precisely defined, in the abstract its essential elements are clearly established: adequate notice, a chance to be heard, and the opportunity to defend oneself before a fair and impartial tribunal having jurisdiction over the case. *Cafeteria and Restaurant Workers Union Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). The Constitution does not mandate that states provide avenues of appellate review of criminal convictions. *Ross v. Moffitt,* 417 U.S. 600, 606, 94 S.Ct. 2437, 2441, 41 L.Ed.2d 341 (1974). It is, however, "fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts." *Rinaldi v. Yeager,* 384 U.S. 305, 310, 86 S.Ct. 1497, 1500, 16 L.Ed.2d 577 (1966) (citations omitted); *accord, Evitts v. Lucey,* 469 U.S. 387, 400–01, 105 S.Ct. 830, 838, 83 L.Ed.2d 821 (1985).

 As discussed above, the conversation between Chief Justice Nix and Judge Diefenderfer must be regarded as a *de facto* appeal of the trial ruling that excluded the tape recording. As a result of the conversation, Judge Diefenderfer unwillingly reversed himself in response to what he perceived to be an order from a higher court mandating admission of the tape.[23] Yohn was denied each of the three essential elements of procedural due process in this *de facto* appeal.

### 1. *Adequate Notice*

 "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they might enjoy that right they must first be notified.'" *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972) (quoting *Baldwin v. Hale,* 68 U.S. (1 Wall.) 223, 233, 17 L.Ed. 531 (1864)). Adequate notice includes the dual safeguards of disclosure of the issues to be addressed and sufficient time for preparation. *In re Gault,* 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1967). Petitioner did not receive adequate notice of the appeal to Chief Justice Nix. The Commonwealth argues that Yohn received notice when, immediately prior to the conversation, Judge Diefenderfer informed the Assistant District Attorney and defense counsel that Chief Justice Nix was on the telephone.[24] This Court concludes that Yohn received notice a bit earlier, when, during the Assistant District Attorney's tantrum after the tape was ruled inadmissible, he asserted that he was going to contact Chief Justice Nix's chambers. This statement came just prior to a brief recess, which was followed by a sidebar conference, the last Commonwealth witness, arguments on objections to the Commonwealth's exhibits, and the first defense witness, whose testimony was interrupted by the call from the Chief Justice. Yohn's counsel was not given anything approaching adequate time to prepare for the *de facto* appeal that followed.

In addition to having almost no forewarning of the contact with Chief Justice Nix, Yohn was never apprised of the issues that would be presented to the Chief Justice. The Assistant District Attorney had stated that he was going to call the Chief Justice's chambers in order to seek a stay of the proceedings so that he might have time to

---

**23.** There is some discussion in the briefing of this Petition regarding whether evidentiary decisions made by state courts are amenable to review in federal habeas corpus proceedings. While rulings on the admissibility of evidence are not ordinarily reviewable by the federal courts, at times they may rise to the level of constitutional violations. *See Crane,* 476 U.S. at 690–91, 106 S.Ct. at 2146–47 (exclusion of evidence of circumstances under which defendant gave confession violated Sixth and Fourteenth Amendment guarantees). At issue here, however, is not the evidentiary ruling that was made, but the process which produced the decision. This Court will not proceed beyond the question of whether the *ex parte, de facto* appeal of the ruling excluding the tape violated Yohn's procedural due process rights to address the further question of whether admission of the tape, by whatever procedure, was in and of itself a violation of constitutional protections.

**24.** An equivalent argument might be that a man working on the railroad tracks has notice of the arrival of a train when he hears its whistle seconds before being crushed beneath its wheels. While the doomed man may, for an instant, know what is about to befall him, there is precious little he can do to avoid it.

file a petition for a Writ of Prohibition. Counsel for defendant had no means of knowing that Chief Justice Nix would address the merits of the tape's admissibility instead of limiting his participation to the question of whether a stay should issue.[25]

### 2. *The Chance to be Heard*

■ From this, it is clear that Yohn was also denied the second component of due process: a chance to be heard. Chief Justice Nix's comments to the trial judge came after an *ex parte* presentation of the facts. Yohn was denied the opportunity to present the merits of his argument to convince Chief Justice Nix that the trial judge's decision should be left undisturbed. "Any real chance [a criminal defendant] may have ... is deprived when the court decides on an *ex parte* examination of the record." *Douglas v. California,* 372 U.S. 353, 356, 83 S.Ct. 814, 816, 9 L.Ed.2d 811 (1963). *Ex parte* review, because it prevents a defendant from demonstrating whatever merit his argument may have, is a violation of the right to due process. *Id.*[26]

### 3. *A Court Having Jurisdiction*

■ The third essential component of procedural due process is that judges must act within the limits of their jurisdiction. *Osborn v. United States Bank,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824). Pennsylvania has elected to provide avenues of appellate review in criminal cases. Having done so, it must ensure that the due process rights of litigants are protected when these avenues are utilized. *Evitts,* 469 U.S. at 400–01, 105 S.Ct. at 838; *Rinaldi,* 384 U.S. at 305, 86 S.Ct. at 1497. The Pennsylvania Supreme Court cannot hear an appeal either by consent of the parties or by its own acquiescence if jurisdiction to hear the appeal is not established by law. Pa. Const. art. 5, § 2(c);

*School District of Borough of West Homestead v. Allegheny County Board of School Directors,* 440 Pa. 113, 269 A.2d 904 (1970).

In Pennsylvania there are three mechanisms for taking an interlocutory appeal:

1. 42 Pa.C.S.A. § 702 and Pa.R.A.P. 1311 and 311 *et seq.;*

2. 42 Pa.C.S.A. § 726 (King's Bench jurisdiction); and

3. a Writ of Prohibition.

■ 42 Pa.C.S.A. § 702 provides authorization for review of interlocutory orders. When a trial court believes that one of its interlocutory orders, in a case where its final order would be within the jurisdiction of an appellate court, involves a controlling question of law as to which there are substantial grounds for difference of opinion, and that an immediate appeal of the order might materially advance the litigation, it may state so in an order. The appellate court having jurisdiction over the case may, in its discretion, permit the interlocutory appeal to be taken. The appellate court with jurisdiction over the rulings of the Court of Common Pleas in a criminal trial is the Pennsylvania Superior Court. 42 Pa.C.S.A. § 742. Pennsylvania Rules of Appellate Procedure 311 and 312 mandate the filing of a petition for review by the party aggrieved by the lower court's order. The party that would defend the appeal must be given notice, Pa.R.A.P. 1311(a), and must be afforded the opportunity to file a brief in opposition, Pa.R.A.P. 1314.

This avenue of appeal was not followed in Yohn's case. First, Judge Diefenderfer did not issue an order declaring the issue of the tape's admissibility to be appropriate for an interlocutory appeal. Second, the issue was not brought before the Pennsylvania Superior Court, which would have been the proper

---

**25.** In fact, Yohn's counsel did not know until after the conversation had ended that the discussion had concerned the question of the tape's admission. This most likely explains why he did not insist on speaking with the Chief Justice. Believing that the discussion was limited to the possibility of a stay being issued, he would have concluded that he would have the opportunity to address the merits of the issue if and when they ever arose.

**26.** *Ex parte* review also constructively interferes with a criminal defendant's Sixth Amendment right to the assistance of counsel. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (criminal defendants are guaranteed assistance of counsel at all crucial stages of proceedings); *Douglas,* 372 U.S. at 355, 83 S.Ct. at 815 (Constitution guarantees right to counsel on direct appeal).

forum for the appeal. Third, and perhaps most significant in due process terms, no petition was ever filed to provide Yohn with notice, nor was he afforded the opportunity to file a brief in opposition.

■ 42 Pa.C.S.A. § 726 grants the Pennsylvania Supreme Court extraordinary King's Bench jurisdiction in certain limited situations. The statute reads:

> Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or district justice of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.

42 Pa.C.S.A. § 726. Such jurisdiction is to be invoked sparingly, in matters of immediate public importance, and where the petitioner's rights are clearly demonstrated by the record. *Philadelphia Newspapers, Inc. v. Jerome,* 478 Pa. 484, 387 A.2d 425, 430 (1978), *appeal dismissed,* 443 U.S. 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979). An application for such relief must be served on all parties who may be affected thereby. Pa. R.A.P. 3309(a). The adverse party may file and answer. Pa.R.A.P. 3309(b). Thereafter, the Supreme Court may grant or deny the application, or set it down for argument. Pa.R.A.P. 3309(c).

Again, this appellate avenue was not followed in the instant case. No application for relief was filed, nor answer permitted. Additionally, the statute speaks to actions of the Supreme Court, not an individual justice thereof. Moreover, the issue presented by the exclusion of the tape recording does not appear to be one suited to King's Bench jurisdiction. While efficient and accurate operation of the criminal justice system is a matter of great importance to the public generally, the introduction of one piece of evidence in one criminal trial does not raise an issue of immediate public importance which would warrant the intervention of the

Supreme Court. Assuming that the ruling did raise an issue of immediate public importance, King's Bench jurisdiction could not be invoked unless the record clearly established the Commonwealth's rights. *Id.* 387 A.2d at 430 n. 11. The decision to exclude the tape was a discretionary one, made consistent with Pennsylvania case law. The record certainly did not clearly indicate that the Commonwealth's position on the admissibility of the tape was correct.[27]

■ The third avenue of appeal, a Writ of Prohibition, is an extraordinary writ designed to prevent unlawful exercise or abuse of jurisdiction. *Philadelphia Newspapers,* 387 A.2d at 430 n. 11. The Pennsylvania Supreme Court has original, but not exclusive, jurisdiction over petitions for a Writ of Prohibition. *Id.* 387 A.2d at 428 n. 2. It is a proceeding between an inferior court and a superior court whereby the superior court exercises control over the inferior to keep it within the limits of its powers and jurisdiction. *Glen Mills Schools v. Court of Common Pleas of Philadelphia County,* 513 Pa. 310, 520 A.2d 1379 (1987). The Writ applies to cases where a lower court attempts to act in a case over which it has no jurisdiction or where the lower court exceeds its authority in adjudicating a case properly before it. *Capital Cities Media, Inc. v. Toole,* 506 Pa. 12, 483 A.2d 1339 (1984). A Writ of Prohibition will "never be granted where there is a complete and effective remedy by appeal, certiorari, a writ of error, injunction, or otherwise." *Carpentertown Coal & Coke Co. v. Laird,* 360 Pa. 94, 102, 61 A.2d 426 (1948).

■ The Assistant District Attorney informed the trial judge that he intended to seek a Writ of Prohibition from the Pennsylvania Supreme Court to compel admission of the tape recording. For several reasons, this procedural mechanism was not employed in the case at bar, nor could it have been. First, Judge Diefenderfer had jurisdiction to rule on the evidentiary question before him. Pennsylvania law places such decisions within the discretion of the trial judge, *Common-*

---

27. It is worth noting that exclusion of the tape recording would not have had the effect of putting the Commonwealth out of court. The testi-

mony of Lynn was sufficient to permit the case to go to the jury.

*wealth v. Leveille,* 289 Pa.Super. 248, 433 A.2d 50 (1981), and Judge Diefenderfer exercised his discretion in excluding the tape. The Writ may direct the exercise of discretion, but not performance of a particular discretionary act. *Philadelphia Newspapers,* 387 A.2d at 430 n. 11. Therefore, while the Supreme Court could have ordered Judge Diefenderfer to rule on the tape's admissibility if he had refused to do so, it could not have directed him to admit (or exclude) the tape.

Also, remedies other than a Writ of Prohibition were available to the Commonwealth. For example, it could have requested an order certifying the issue for interlocutory appeal, but did not. This would preclude issuance of the Writ. *Carpentertown Coal,* 360 Pa. at 102, 61 A.2d 426. Finally, there is no authority supporting the proposition that one justice, acting alone, has authority to issue a Writ of Prohibition.

■ The three avenues of appeal discussed above are the only ones with possible applicability to Yohn's case that are provided by Pennsylvania law. The existence of these procedures created due process rights in Yohn. *See Evitts,* 469 U.S. at 400–01, 105 S.Ct. at 838; *Rinaldi,* 384 U.S. at 305, 86 S.Ct. at 1497. These rights were violated when the established appellate procedures

were not followed and Chief Justice Nix acted outside the scope of his authority. *Osborn,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204.[28]

### 4. *The Commonwealth's Argument*

■ The Commonwealth offers a specious argument in support of its contention that Yohn's procedural due process rights were not violated. The Commonwealth notes that both the *en banc* panel of the Court of Common Pleas and the Pennsylvania Superior Court held the tape recording to be admissible. Because it was not error to admit the tape, the process by which it was admitted is, in the Commonwealth's view, irrelevant.[29] There are two fundamental misperceptions in this argument: one of constitutional law and one of Pennsylvania law. First, it assumes that the procedural due process guarantees of the Fourteenth Amendment do no more than assure correct results, when they actually ensure a basic threshold of fairness in the mechanism that brings the results about.[30] Yohn was constitutionally entitled to have notice that Chief Justice Nix was going to speak to the merits of the tape's admissibility, to have the opportunity to present his arguments to the Chief Justice, and to have the issue of admissibility decided by a judge authorized to do so. It was the deprivation of these rights that forms the basis of the violation; the admission of the

---

**28.** The Commonwealth argues for some sort of "exigent circumstances" exception to the requirement that due process be observed in all cases. It puts forth the theory that the notice requirement should be adjusted so that, in urgent circumstances, inadequate notice may be given without penalty. The concept of adequate notice is not currently a rigid one, mandating only that notice be given "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). This Court has applied this flexible concept here. To hold as the Commonwealth asks, and find that the paucity of warning given to Yohn (both in a temporal and a substantive sense) meets with due process requirements merely because the Commonwealth perceived an emergency, would be to eviscerate the protections of the Fourteenth Amendment.

Moreover, the situation was not quite as urgent as the Commonwealth asserts. The prosecution had rested its case when the conversation with the Chief Justice took place, and was permitted to reopen its case to admit the tape after the conversation. The prosecution, Judge Diefender-

fer and the Chief Justice could have delayed any action until the defense had the opportunity to prepare and present a response because, as a practical matter, the prosecution could have been allowed to reopen its case at any time prior to the start of the jury's deliberations.

**29.** The Court recognizes the Commonwealth's legitimate desire to seek just punishment for crimes against its citizens. As Justice Brandeis noted, however, "[t]he greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 573, 72 L.Ed. 944 (1928).

**30.** Actually, the Fourteenth Amendment procedural due process requirements do not speak at all towards accuracy of results, except indirectly. What is assured is that certain processes will be observed. The aim of these protections is to increase chances of accurate decisions being made. Incorrect results, however, will not *per se* violate procedural due process unless arrived at through defective procedures.

tape was merely the result of the constitutional infirmity.

■ Second, the Commonwealth presumes that only one proper answer to the question of the tape's admissibility existed. The law in Pennsylvania does not support this assumption. At the time of Yohn's trial, the Pennsylvania Supreme Court had not spoken definitively on when a questionably audible tape recording could be admitted at a criminal trial. The case that was regarded as controlling in Pennsylvania was a decision of the Pennsylvania Superior Court in *Commonwealth v. Leveille*, 289 Pa.Super. 248, 433 A.2d 50 (1981). The Superior Court, drawing on case law from various other states and the federal courts, held that a tape will be admissible "unless the inaudible portions or omissions are so substantial as to render the recording as a whole untrustworthy." 433 A.2d at 52. Significantly, the court also held that the matter of admissibility should be left to the sound discretion of the trial judge, who is in the best position to "determine the audibility of the tape and its trustworthiness as evidence." [31] *Id.* Because the admission of a tape is left to the discretion of the trial judge, an appellate court would be unlikely to reverse a decision either to exclude or admit it. Considering the findings of Judge Diefenderfer that the tape was inaudible, "an absolute absurdity" and "absolutely prejudicial," it is inconceivable that an appellate court would have reversed his ruling excluding the tape.

On the issue of the tape's admission there was more than one correct discretionary ruling that could have been made. The decision to exclude the tape that was made by Judge Diefenderfer was within his discretion to make, and was a proper exercise of such discretion, as it was adequately supported by his findings on the record. The intervention of Chief Justice Nix caused this decision to be reversed improperly, the tape was admit-

ted, and it was determined on appeal that the tape was properly admissible.[32] It was never indicated by the Pennsylvania Superior Court, however, that exclusion of the tape would have been error. But for the improper interference, the tape would not have been played to the jury, and the ruling excluding the tape would have remained undisturbed on appeal. Thus, the process leading to the tape's admission was not, as the Commonwealth asserts, irrelevant. In fact, it was crucial to the issue currently before this Court.

### B. Harmless Error

■ Constitutional error has been divided by the federal courts into two categories: structural error and trial error. Structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is *per se* prejudicial. *Arizona v. Fulminante*, 499 U.S. 279, 309–11, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). Error of the trial type occurs during presentation of the case to the jury, and is subject to harmless error analysis. *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993) (trial error amenable to harmless error analysis because it may be quantitatively assessed in the context of all other evidence). The vast majority of cases involving constitutional error are given to harmless error review. *Id.* at ——, 113 S.Ct. at 1727 (White, J., dissenting); *id.* at ——, 113 S.Ct. at 1730 (O'Connor, J., dissenting) ("By now it goes without saying that harmless-error review is of almost universal application; there are few errors that may not be forgiven as harmless"). The procedural due process violation in this case can best be described as trial error; it led to the introduction of the tape recording, which can be assessed in the context of the entirety of the evidence at trial. Therefore, the violation will be reviewed under the harmless error standard.[33]

---

**31.** It is worth repeating at this point that Chief Justice Nix never heard the tape recording at issue.

**32.** Of course, the *en banc* panel and the Superior Court chose to avoid the more substantial issue presented: whether the intervention of Chief Justice Nix was proper.

**33.** Arguably, the constitutional violation in this case can be characterized as structural error. A criminal defendant has the right to counsel at all crucial stages of the proceedings, including on appeal. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Douglas v. California*, 372 U.S. 353, 355, 83 S.Ct. 814, 815, 9 L.Ed.2d 811 (1963). The denial of this right

### 1. *The Burden of Pleading*

██ Like other defenses, harmless error must be raised by the state; failure to do so in a timely and unequivocal fashion waives the defense. *Holland v. McGinnis,* 963 F.2d 1044, 1057–58 (7th Cir.1992) (state waived harmless error defense by raising it for the first time during oral argument before court of appeals), *cert. denied,* —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993); *Wilson v. O'Leary,* 895 F.2d 378, 384 (7th Cir.1990) (waiver of harmless error defense by state's withholding of defense until reply brief; "[p]rocedural rules apply to the government as well as to defendants"). Were the burden of pleading harmless error not placed on the state, it could limit its initial efforts to arguing that error did not occur, thus "seek[ing] a favorable ruling on the merits . . . while holding the defense in reserve for use" after a finding of constitutional error. *Granberry v. Greer,* 481 U.S. 129, 132, 107 S.Ct. 1671, 1674, 95 L.Ed.2d 119 (1987).

██ In the instant case, the Commonwealth failed to raise harmless error as a defense in its Answer to the Petition. Harmless error was not raised until the Commonwealth filed its objections to the Report and Recommendation of Magistrate Judge Smith. This Court could deem the defense waived, finding that the Commonwealth sought first a favorable ruling on the merits, "holding the defense in reserve for use" after Magistrate Judge Smith ruled against it on the merits of the Petition. *See Id.*

The Commonwealth did, in the state court brief that constitutes its supplemental submission to Magistrate Judge Smith, advance the argument that the decision to admit the tape was correct under Pennsylvania law, and that therefore the procedure leading to its admission is irrelevant. This Court has already pointed out the fallacy of this argument. The decision to exclude the tape was also consistent with Pennsylvania law, and had been made by the trial judge. Therefore, the procedure by which the tape was admitted is vital to the constitutional issues here presented. The procedure was violative of due process, and, absent this violation, the tape would have been excluded. Thus, the harmless error analysis must focus on the effect of the tape's admission on the trial. The Commonwealth's argument, in this context, is not truly a harmless error defense. Though to classify it as such is tenuous at best, in an abundance of caution this Court will credit the Commonwealth with having raised harmless error, and proceed with the analysis.

### 2. *The Burden of Proof*

██ For many years, the case of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), governed the procedure for harmless error review in federal cases, both on direct and collateral review. In *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the United States Supreme Court announced a new standard for harmless error in federal habe-

---

has been held to be within the scope of structural error, and thus *per se* prejudicial. *Penson v. Ohio,* 488 U.S. 75, 88, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988). As discussed in the procedural due process section of this Memorandum, Yohn was effectively denied the right to counsel during the *de facto* appeal before Chief Justice Nix.

Violation of a defendant's right to appeal has also been held to be structural error requiring *per se* invalidation of a conviction. *See Lozada v. Deeds,* 498 U.S. 430, 432, 111 S.Ct. 860, 862, 112 L.Ed.2d 956 (1991) (*per curiam*). If denial of the right to appeal constitutes structural error it follows logically that denial of the opportunity to defend against an appeal taken by the prosecution is also structural error. Even after his conviction, Yohn was constructively denied his right to appeal Chief Justice Nix's intervention in his

trial. The Pennsylvania Superior Court avoided the issue by hiding behind the proscription against the Superior Court reviewing decisions of the Supreme Court rather than addressing the genuine issue of whether Chief Justice Nix's actions were proper, and thus truly actions of the Supreme Court. The Pennsylvania Supreme Court likewise dodged consideration of the issue by denying allocatur and, adding insult to injury, took three and one half years in doing so.

These examples of structural error are by no means exhaustive. They are offered merely as situations analogous to the instant case. More detailed analysis would be superfluous in light of this Court's election to apply harmless error analysis to the Petition. It is worth noting that harmless error analysis is more favorable to the Commonwealth.

as cases.[34] *Chapman* squarely placed the burden of proving harmlessness on the state. 386 U.S. at 24, 87 S.Ct. at 828 ("beneficiary of a constitutional error" must prove "that the error complained of did not contribute to the verdict obtained"). *Brecht* did not specifically address the issue of which party bears the burden of proof on harmlessness, though it can be read to have left intact the previously existing allocation of this burden to the state.[35] The Third Circuit has held, however, that *Brecht* shifted the burden of proof to the petitioner. *Robinson v. Arvonio*, 27 F.3d 877, 885 (3d Cir.1994).[36]

In *O'Neal v. McAninch*, —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Supreme Court discouraged the phrasing of harmlessness inquiries in terms of burdens of proof. In *O'Neal*, the Sixth Circuit held that

a habeas petitioner bore the burden of disproving harmlessness, so that where the court was left in "grave doubt" as to an error's harmlessness the petitioner had failed to meet his burden, and the writ must be denied. 3 F.3d 143, 145 (6th Cir.1993). The Supreme Court noted that the concept of "burden of proof" had little application to harmless error review in habeas proceedings: habeas proceedings do "not involve a judge who shifts a 'burden' to help control the presentation of evidence at trial, but rather involves judges who apply a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect." —— U.S. at —— – ——, 115 S.Ct. at 994–95. The Court instructed federal judges to ask directly: "Do I, the judge, think that

---

**34.** The change in standards will be discussed in detail *infra*.

**35.** There are several reasons for this reading of *Brecht*. First, the language of the opinion itself must be considered. The majority opinion does not contain any passage devoted to the burden of proof. Other parts of the opinion express the rule that issues "not squarely addressed" by the Court should not be deemed decided. *Brecht*, —— U.S. at ——, 113 S.Ct. at 1718. Additionally, the Court acknowledged the difference between the *"Chapman ... standard for determining whether a conviction must be set aside because of federal constitutional error,"* id. at ——, 113 S.Ct. at 1713, and *Chapman*'s placing on the state the "burden of proving that an error passes muster under this standard," *id.* at ——, 113 S.Ct. at 1717. Yet the Court, in explaining how its opinion altered *Chapman*, referred only to the *Chapman* standard. *Id.* at ——, ——, —— – ——, 113 S.Ct. at 1714, 1718, 1721–22. This gives rise to the inference that the *Brecht* decision left *Chapman*'s allocation of the burden of proof unchanged.

Second, the clear and explicit holding of *Brecht*, which appears repeatedly in the majority opinion and concurrence, is that, to the extent that existing law on harmless error was being changed, it was through adoption of the harmless error standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See, e.g., Brecht,* —— U.S. at —— – ——, —— – ——, 113 S.Ct. at 1713–14, 1721–22; *id.* at ——, 113 S.Ct. at 1724 (Stevens, J., concurring). *Kotteakos* placed the burden of proof on the government. 328 U.S. at 760–61, 66 S.Ct. at 1245–46. Third, Justice Stevens wrote an opinion explicitly to state that he would not have joined the majority, and thus provided the decisive fifth vote, but for his understanding that the decision placed the burden of proving harmlessness on the state. *Brecht,* —— U.S. at ——, 113

S.Ct. at 1723 (Stevens, J., concurring). Fourth, and finally, five justices in *Brecht* endorsed harmless error rules that allocate the burden of proof to the state. *Id.* at —— – ——, 113 S.Ct. at 1723–24 (Stevens, J., concurring); *id.* at ——, 113 S.Ct. at 1727 (White, J., dissenting, joined by Blackmun and Souter, JJ.); *id.* at ——, 113 S.Ct. at 1729 (O'Connor, J., dissenting).

Therefore, despite *Brecht*'s failure to specifically set forth which party bears the burden of proving harmlessness in a federal habeas proceeding, the most sound reading of the case places the burden on the state.

**36.** The *Robinson* decision reaches this conclusion by quoting one sentence from *Brecht* which states that habeas petitioners are entitled to relief if they "can establish that [the error] resulted in 'actual prejudice.'" 27 F.3d at 885 (quoting *Brecht,* —— U.S. at ——, 113 S.Ct. at 1712 (citing *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986))). *Lane* was a case on direct appeal assessing the harmlessness of the misjoinder of parties, and espousing the standard set forth in *Kotteakos*. 474 U.S. at 449, 106 S.Ct. at 732. *Lane* did not address the allocation of the burden of proof, which, as noted previously, is placed on the state in *Kotteakos*. Therefore, *Brecht*'s isolated comment that habeas petitioners are required to establish prejudice does not find support in *Lane*. Additionally, as discussed above, the remainder of the *Brecht* opinion compels the conclusion that the burden of proving harmlessness is borne by the state. The judgment of the Third Circuit in *Robinson* was vacated by the United States Supreme Court, and the case remanded for consideration under the decision in *O'Neal v. McAninch*, —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), discussed *infra*. *Robinson v. Arvonio*, —— U.S. ——, 115 S.Ct. 1247, 131 L.Ed.2d 129 (1995).

the error substantially influenced the jury's decision?" rather than "Do I believe the party has borne its burden of showing . . . ?" — U.S. at ——, 115 S.Ct. at 995. In essence, the issue of burden of proof is now irrelevant to harmlessness inquiries.[37]

### 3. The Standard for Assessing Harmlessness

For decades prior to *Brecht,* the federal courts applied the same rule for assessing harmlessness in habeas cases as they applied on direct appeal of federal and state convictions. Under that rule, constitutional violations required relief unless proven by the government to be harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967). Though *Chapman* arose on direct appeal, its rule was repeatedly applied in habeas cases by the Supreme Court and the lower federal courts. *See, e.g., Yates v. Evatt,* 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991); *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Lesko v. Lehman,* 925 F.2d 1527 (3d Cir.), *cert. denied,* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991); *Wilson v. Murray,* 806 F.2d 1232 (4th Cir. 1986), *cert. denied,* 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 149 (1987). In *Brecht,* however, a five member majority of the Supreme Court ruled that a different measure of harmless error should apply in federal habeas proceedings, adopting the standard fashioned for assessment of nonconstitutional errors in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). —— U.S. at ——, 113 S.Ct. at 1722. Under this standard, an error may be deemed harmless if "the error did not influence the jury, or had but very slight effect" and that "the judgment was not substantially swayed by

the error." *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. at 1248. Or, in the language most frequently taken from *Kotteakos* by the *Brecht* Court, "the standard for determining whether habeas relief must be granted is whether . . . the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht,* —— U.S. at ——–——, 113 S.Ct. at 1713–14 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253); *accord Brecht,* —— U.S. at ——, —— n. 7, ——, 113 S.Ct. at 1718, 1718 n. 7, 1722; *id.* at ——, 113 S.Ct. at 1724 (Stevens, J., concurring).[38]

Though *Brecht* made clear the new standard to be applied in harmless error review of habeas cases, it left much unsaid about the precise meaning and application of this standard. For example, *Brecht* is silent on the degree of certainty by which a reviewing court must be convinced that an error had no, or some, substantial effect. Additionally, the focus of the harmlessness inquiry is incompletely addressed: must the error be assessed in context of the actual jury's verdict or that of a hypothetical new trial? Finally, as *Brecht*'s decision applied the standard only to the particular facts before the Court, the opinion discusses few factors relevant to the new standard.[39]

While *Brecht* itself did not speak directly to the issue of the degree of certainty required in a harmless error determination, *Kotteakos* did make clear pronouncements in this area. According to *Kotteakos,* invalidation of a conviction is required upon a finding of error unless "the conviction is sure that the error did not influence the jury" or "if one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error." 328 U.S. at 765, 66 S.Ct. at 1248. To similar effect is the statement that "[t]he inquiry . . . is . . . whether the error

---

**37.** The *O'Neal* Court specifically wrote that the language in *Brecht* cited by the Third Circuit in *Robinson* was not determinative of the issue of burden of proof. —— U.S. at ——, 115 S.Ct. at 995–96. The Court noted that *Brecht* was limited to choosing between the *Chapman* and *Kotteakos* standards, and that both standards placed the risk of doubt (interpreted by some courts as the burden of proof) on the state.

**38.** The Court justified this difference in standards between direct and collateral review by advancing the same principles articulated in the discussion of federal court restraint in granting writs of habeas corpus contained in footnote 20 of this Memorandum. *Brecht,* —— U.S. at ——–——, 113 S.Ct. at 1720–21.

**39.** The Third Circuit has not yet had the opportunity to specifically address any of these questions.

itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* The Supreme Court reaffirmed these pronouncements in *O'Neal.* —— U.S. at ——–——, 115 S.Ct. at 995–96.

 *Brecht*'s reference to *Kotteakos* also provides the answer to the second query posed above: whether the focus of the inquiry is on the actual jury verdict or on a hypothetical new trial. "[T]he standard for determining whether habeas relief must be granted is whether … the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht,* —— U.S. at ——–——, 113 S.Ct. at 1713–14 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253). The relevant question is whether the error substantially affected the actual thinking of the jury or the deliberative process by which it reached a verdict. *See Brecht,* —— U.S. at ——, 113 S.Ct. at 1724 (Stevens, J., concurring) ("The habeas court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place. *Kotteakos* is full of warnings to avoid that result"). Indeed, *Kotteakos* took great pains to instruct judges that the touchstone of harmless error review is not whether "there was enough [evidence] to support the result, apart from the phase affected by the error" or whether "the evidence offered … properly to convict [the] defendant would be sufficient to sustain his conviction, if submitted in a separate trial" or whether "conviction would, or might probably, have resulted in a properly conducted trial" or even whether "the evidence concerning [the] petitioner was so clear that conviction would have been dictated and reversal forbidden, if it had been presented in [a proper trial]." *Kotteakos,* 328 U.S. at 763–65, 767, 775–76, 66 S.Ct. at 1247–48, 1249, 1252–53. Rather, "[t]he crucial thing is the impact of the thing done wrong on the minds of [the jurors]." *Id.* at 764, 66 S.Ct. at 1247–48. "To apply the *Kotteakos* standard properly, a court must … make a *de novo* examination of the record." *Brecht,* —— U.S. at ——, 113 S.Ct. at

1724 (Stevens, J., concurring); *accord United States v. Lane,* 474 U.S. 438, 448, 106 S.Ct. 725, 731, 88 L.Ed.2d 814; *Kotteakos,* 328 U.S. at 762, 764, 66 S.Ct. at 1246, 1247.

 *Brecht* dealt with the erroneous admission of testimony of the petitioner's post-*Miranda* silence, finding the error harmless because it was merely cumulative of the state's "extensive and permissible references to [the] petitioner's pre-*Miranda* silence." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722. That case, not factually analogous to the instant case, is therefore of little utility. Other cases, however, do provide useful guidance. The relative weakness of the properly admitted evidence is relevant, to the extent that it bears on the question of whether the constitutional error affected the thinking of the actual jurors. *Lane,* 474 U.S. at 450, 106 S.Ct. at 732. Also relevant in cases where evidence is improperly admitted is the extent to which the evidence was likely to influence the jury's verdict because it was particularly salient or probative of the ultimate issue. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, 294–98, 111 S.Ct. 1246, 1257–58 (opinion of White, J., joined in pertinent part by Marshall, Blackmun, Stevens and Kennedy, JJ.) (erroneous admission of coerced confession can rarely be deemed harmless because "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J., dissenting))).[40] The extent to which the improperly admitted evidence is emphasized by the prosecutor is likewise relevant. *See, e.g., United States v. Ariza–Ibarra,* 605 F.2d 1216, 1223 (1st Cir. 1979). Finally, the egregiousness of the error is a factor in assessing its harmlessness. *See, e.g., Kotteakos,* 328 U.S. at 772–74, 66 S.Ct. at 1251–52 (egregiousness of violation before Court distinguished it from prior cases finding similar violations harmless).

---

**40.** The tape recording admitted here was not technically a confession by Yohn. As it purported to reveal incriminating statements made by him, however, it had the same practical and probative effect as a confession.

#### 4. *Application of the Standard*

 This Court must answer the question that *O'Neal* instructs it to pose: "Do I, the judge, think that the error substantially influenced the jury's decision?" — U.S. at ——, 115 S.Ct. at 995. Technically, the error here was a procedural due process one, though practically it was similar to those involving the improper admission of evidence, as it led to the introduction of the tape recording. Therefore, this Court may rephrase the question to read: "Do I, the judge, think that hearing the tape substantially influenced the jury's decision?" The answer to this question is an unqualified "Yes."

The prosecutor in Yohn's trial referred to the existence of the tape recording during *voir dire,* thus alerting the jury to the existence of purportedly inculpatory statements made by Yohn even prior to the start of the presentation of evidence. The tape recording was emphasized in the prosecution's opening, and again in its closing. Moreover, the jury was made aware, indirectly, of the dispute that raged about the admissibility of the tape. Judge Diefenderfer, after issuing his ruling excluding the tape, instructed the jury that he had so ruled after originally declaring the tape to be admissible. Then, after the contact from the Chief Justice, the trial judge permitted the prosecution to reopen its case to play the tape. The jury must have concluded from these unusual circumstances that the tape recording was somehow central to the prosecution's case against Yohn.

The prosecution had virtually no physical evidence linking Yohn directly to the crime. Southerland, who had claimed to the authorities that Yohn had been present during the crime and was the one who shot Kollar, fled before trial, and therefore did not testify. The bulk of the prosecution's case came from the testimony of Lynn, who was testifying in exchange for favorable treatment from the Commonwealth. Additionally, Lynn was an admitted drug addict. The jury would not have viewed Lynn as a credible witness, making the tape, as supposedly independent corroborating evidence, essential to the jury's determination.[41]

The tape recording, though nearly inaudible, was characterized by the prosecution as containing inculpatory statements made by Yohn. This evidence would doubtless have had great effect on the jury. Perhaps no other type of evidence is accorded such great weight as the self-incriminating statements of a criminal defendant. *Fulminante,* 499 U.S. at 313, 111 S.Ct. at 1266–67 (Kennedy, J., concurring) ("If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence.").

Finally, the constitutional violation in this case was particularly egregious. The tape recording was admitted despite the trial judge's findings that it was inaudible and "absolutely prejudicial." His exercise of discretion, informed by his position as trial judge to be best able to "determine the audibility of the tape and its trustworthiness as evidence," *Commonwealth v. Leveille,* 289 Pa.Super. 248, 433 A.2d 50, 52 (1981), was vitiated when he determined that Chief Justice Nix ordered admission of the tape. The Chief Justice was in no position to make a ruling on the tape's admissibility, having never heard it. His interference in the trial was, as discussed in detail above, nothing other than a gross abuse of the jurisdictional limits

---

41. The Commonwealth conceded the importance of the tape recording in its supplemental filing before Magistrate Judge Smith. Footnote 11 of that filing states:

In this capital case, because the Commonwealth's main witness, Southerland, fled immediately prior to the trial, the Commonwealth was left with basically one co-defendant, in addition to the tape recording. Since this co-defendant's testimony would be subject to attack on both the bases that he was a drug addict and a corrupt source, it was not unreasonable for the Commonwealth to believe that

of his power.[42] The egregiousness of the constitutional violation in this case strengthens the conclusion that the error was not harmless. *See Kotteakos*, 328 U.S. at 772–74, 66 S.Ct. at 1251–52.

## C. The Remedy

 Having concluded that constitutional error occurred in Yohn's trial, and that the error was not harmless, this Court determines that the writ of habeas corpus must be granted. The final issue to be addressed is the appropriate remedy to be ordered. Federal courts have broad discretion in conditioning judgment for habeas relief, being required to act "as law and justice require." *Hilton v. Braunskill*, 481 U.S. 770, 775, 107 S.Ct. 2113, 2118, 95 L.Ed.2d 724 (1987) (quoting 28 U.S.C. § 2243). Federal courts may delay the release of a successful habeas petitioner in order to permit the state to correct the constitutional violation. *Id.; Rogers v. Richmond*, 365 U.S. 534, 549, 81 S.Ct. 735, 744, 5 L.Ed.2d 760 (1961); *accord United States ex rel. Thomas v. New Jersey*, 472 F.2d 735, 742 (3d Cir.) (district court order may either order unconditional release or order release in near future if new trial has not been afforded), *cert. denied sub nom., New Jersey v. Thomas*, 414 U.S. 878, 94 S.Ct. 121, 38 L.Ed.2d 123 (1973). The typical relief granted a successful habeas petitioner is not unconditional release, but rather an order directing the release of the petitioner if a new trial is not conducted within a defined period of time. *Herrera v. Collins*, ─── U.S. ───, ───, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993). When a new trial is ordered, the state should be afforded a reasonable time for conducting a retrial. *Irvin v. Dowd*, 366 U.S. 717, 729, 81 S.Ct. 1639, 1646, 6 L.Ed.2d 751 (1961).

Pennsylvania allows one hundred and twenty days for a new trial to commence after a trial court or appellate court has ordered a new trial. Pa.R.Crim.P. 1100(d)(1) and (d)(2). These time limits are, of course, not binding on this Court. This Court does find them to be reasonable, however, and will order Yohn released if not retried within one hundred and twenty days of the date of the attached Order granting the petition.[43]

 Federal courts are to act "as law and justice require" in fashioning habeas relief.

---

the tape recording, which corroborated his testimony, was essential to its case.

**42.** *Brecht* appears to have created an exception to the rule that all trial errors are to be subjected to harmless error analysis for cases of egregious error:

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not 'substantially influence' the jury's verdict.

─── U.S. at ─── n. 9, 113 S.Ct. at 1722 n. 9. To this exception may be added the Court's suggestion that "affirmative evidence that state-court judges are ignoring their oath" to uphold federal constitutional law may call for application of a less forgiving harmless error rule "to deter state courts from relaxing their own guard in reviewing constitutional error." *Id.* at ───, 113 S.Ct. at 1721.

Yohn has not pursued a claim of prosecutorial misconduct in the instant petition. That does not prevent this Court, however, from commenting on the behavior of the prosecution or assessing its effect on the proceeding. The Assistant District Attorney prosecuting Yohn displayed an utter lack of professionalism and restraint in his attacks on the trial judge after the tape was ruled inadmissible. It was this abhorrent conduct that caused the initial recess to be granted, and that set in motion the procedural due process violation.

Moreover, Chief Justice Nix displayed no regard for the constitutional rights of Yohn when he interceded in the trial. Judge Diefenderfer also failed to honor his obligations to Yohn by blindly following the directive of the Chief Justice rather than questioning the authority of Chief Justice Nix to act. Additionally, the *en banc* panel of the Court of Common Pleas, the Pennsylvania Superior Court and the Pennsylvania Supreme Court all ignored Yohn's constitutional claim, choosing instead to protect the Pennsylvania judiciary from any embarrassment that might have arisen from a close scrutiny of the action of the judges involved.

While this case might very well fit into the exception to harmless error review created in *Brecht*, this Court does not have the need to squarely address the issue in light of the fact that the error in this case is not harmless.

**43.** This Court is not now passing on the question of whether retrial is barred by the prohibition against placing a criminal defendant twice in jeopardy. This issue is more properly addressed in the first instance by the state trial judge called upon to preside over any retrial.

28 U.S.C. § 2243. Therefore, courts are given broad discretion in this area. *Hilton,* 481 U.S. at 775, 107 S.Ct. at 2118. This Court is convinced that an Order limited to directing Petitioner's release absent a retrial is an insufficient remedy for the constitutional violation found here. A proper remedy is to order Yohn released unless afforded a new trial conducted without admission of the tape recording at issue.

This conclusion does not presume to rule on the admissibility of the tape under Pennsylvania law; that question is not appropriately addressed by this Court. *See Crane v. Kentucky,* 476 U.S. 683, 689, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (ordinary evidentiary rulings generally outside the scope of federal review). Exclusion of the tape at any retrial is, however, the only means of rectifying the constitutional violation that occurred here. But for the violation, Yohn would have been tried without the tape's admission in evidence. To permit introduction of the tape in a new trial would, in essence, render the habeas proceeding a nullity by vindicating Yohn's constitutional rights in the abstract while having no practical effect. Such an elevation of form over substance is inconsistent with the policies underlying the federal habeas system.

## V. *Conclusion*

For the reasons stated above, the Petition for Writ of Habeas Corpus will be granted, and Yohn ordered released from custody unless afforded a new trial, without admission of the tape recording discussed herein, within one hundred and twenty days. Should the Commonwealth elect to retry Petitioner, this Court can only hope that the prosecution and state judiciary do so with greater regard for his constitutional rights than has been demonstrated to date. While not directly relevant to the instant Petition, and having no impact on this decision, this Court cannot turn a blind eye to the fact that too often members of the Pennsylvania state appellate judiciary have shaken the confidence of the people in the fair and impartial administration of justice in this Commonwealth. This instance is but one of many in which the judges of Pennsylvania have appeared to act with more than the evenhanded application of the law in mind, and is a painfully unfair stigma on the records of the overwhelming majority of Pennsylvania state court judges who perform their duties competently and conscientiously.

Perhaps something will be learned from this case, and the disposition of the Petition will serve to benefit more persons than just Yohn himself. For, after all, "it is from petty tyrannies that large ones take root and grow. This fact can be no more plain than when they are imposed on the most basic rights of all. Seedlings planted in that soil grow great and, growing, break down the foundations of liberty." *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1944) (Rutledge, J.).