*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0143P (6th Cir.)
File Name: 02a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

VINCENT L. CALVERT,
    *Petitioner-Appellant,*

    *v.*
                No. 00-3713

JULIUS WILSON, Warden,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-00177—George C. Smith, District Judge.

Argued: October 31, 2001

Decided and Filed: April 24, 2002

Before: SILER and COLE, Circuit Judges; STAFFORD,[*] District Judge.

---

**COUNSEL**

**ARGUED:** Siobhan R. O'Keeffe, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Stuart A. Cole, OFFICE OF

---

[*]The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Siobhan R. O'Keeffe, David H. Bodiker, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee.

STAFFORD, D. J., delivered the opinion of the court, in which SILER, J., joined. COLE, J. (pp. 20-25), delivered a separate opinion concurring in the judgment only.

————————————

**OPINION**

————————————

STAFFORD, District Judge. Petitioner, Vincent L. Calvert ("Calvert"), appeals the denial of his petition for writ of habeas corpus by a person in state custody. We reverse.

## I. THE EVIDENCE

In February of 1996, the grand jury of Guernsey County, Ohio, returned an indictment charging Calvert and Erwin Mallory ("Mallory") with one count of aggravated robbery and one count of aggravated murder with a death penalty specification. Although charged in the same indictment with the same offenses, Calvert and Mallory were tried separately. Calvert went to trial first.

At Calvert's trial, the prosecutor introduced a statement given by Calvert to police officers after his arrest. According to Calvert, on the afternoon of February 4, 1996, he spent three or four hours playing cards and drinking whiskey with Robert Bennett ("Bennett") in Bennett's apartment. When he left Bennett's apartment at four or five o'clock in the afternoon, Calvert first went to the apartment of Paul Bates, from whom he borrowed some money, then went to the apartment of an acquaintance, Cindy Chalfant ("Chalfant"),

who lived in the apartment next to Bennett's. Mallory soon after knocked on Chalfant's door and asked Calvert to go next door with him to see Bennett, who--Mallory said--had ripped Mallory off the previous night for one hundred dollars. When Bennett, a white man, saw Mallory at his door, he immediately began yelling at Mallory, using a racial epithet and telling him to get out. All three men were intoxicated.

Calvert told police officers that, not thirty seconds after Mallory and Calvert entered Bennett's apartment, Mallory pulled a hatchet from under his field jacket and started hitting Bennett on the back of the head. After several hits, Mallory stopped the beating and even helped Bennett into a chair at the kitchen table. He began the beating again, however, this time with a stick, when he heard Bennett ask Calvert to help him get Mallory out of his house. When the stick broke, Mallory picked up a butcher knife and--approaching Bennett from behind--slashed Bennett across the throat. Calvert, who was sitting at the table facing Bennett when blood started flying, got up from his chair, told Mallory he was crazy, and ran from the scene, leaving Mallory and Bennett--still alive at the time--in the apartment.

Calvert explained that, after leaving Bennett's apartment, he took a cab to a bar in Byesville, Ohio. He stayed at the bar until closing, at which time friends took him to his home, which was also in Byesville. The next morning, he took a cab to Chalfant's apartment where police officers soon after found him still dressed in the blood-spattered clothes he was wearing the evening before. Calvert told the officers that he neither killed Bennett nor knew anything about Mallory's plan to kill him. Calvert was placed under arrest and taken to the police department where he gave the statement that was later heard by the jury at trial.

The prosecutor called Mallory as a witness, but Mallory asserted his Fifth Amendment privilege against self-incrimination and refused to testify. Over defense counsel's objection, the trial court then admitted a tape-recorded confession given by Mallory to the police after his arrest. In

that confession, Mallory described a different version of the events that resulted in Bennett's death.

Mallory admitted that he and Bennett argued on February 3, 1996, the day before the murder, about some money Mallory claimed he had won from Bennett in a card game. A neighbor broke up the argument, telling Mallory--among other things--to put down the ax he was using to threaten Bennett. Mallory did not explain to the officers why he had taken an ax to Bennett's apartment.

Mallory told the officers that Bennett invited both Mallory and Calvert to play cards with him the very next evening, February 4, 1996. After playing cards for approximately fifteen minutes, Mallory and Calvert left Bennett to go to Mallory's apartment where they armed themselves with knives and a hammer for the purpose of killing Bennett. The two men soon after returned to Bennett's apartment, where--according to Mallory--they both attacked Bennett, Calvert using the hammer and a paring-type knife, Mallory using a butcher knife and Bennett's walking stick. Mallory said that after he and Calvert had beaten and stabbed Bennett multiple times, Calvert slashed Bennett's throat. The two then left Bennett's apartment.

While Calvert returned to Chalfant's apartment to call a cab, Mallory returned to his own apartment to change clothes. Mallory admitted that, while he was there, he disposed of the murder weapons. He threw the hammer out a window in his apartment and he dropped the knives in the storm sewer in front of his apartment building. Mallory explained that a third knife, which was found by police officers inside Mallory's building on the ground floor, was not used on Bennett.

Responding to Calvert's call, a Round the Clock Cab Company cabdriver picked up both Calvert and Mallory, taking them to a bar in Byesville. Mallory said that he left the bar about thirty minutes later to go back to his apartment. He was arrested the next day at home.

essentially asked this Court to do as much, particularly given the broad sweep of responsibilities that is accorded to the respondent in these proceedings and the liberty interests at stake.

For the aforementioned reasons, I concur in the judgment only of the majority opinion.

to conduct harmless error review.[4]   Instead, respondent reiterates the finding of the district court that prior to the Supreme Court's decision in *Lilly*, "respondent's primary argument was that Mallory's statement was admitted under a firmly rooted exception to the hearsay rule. The significance of a harmless error argument did not manifest itself until the decision in *Lilly*." This reasoning is wholly inapposite. As an initial matter, that *Lilly* was not yet decided at the time respondent was putting together his brief is entirely irrelevant. The decision in *Lilly* was based upon a firmly established line of Supreme Court precedent; the *Lilly* court was clear in stating that the Court's holding was simply a logical extension of the Court's prior Confrontation Clause decisions. *See Lilly* at 134 ("Today we merely reaffirm [*Bruton, Cruz, and Gray*] and make explicit what was heretofore implicit: A statement that falls into the category summarized in *Lee*-- a confession by an accomplice which incriminates a criminal defendant-- does not come within a firmly rooted hearsay exception.") Furthermore, if the respondent expected that his chief argument-- that, notwithstanding the holdings in *Gray, Cruz, Lee,* and *Bruton*, a co-defendant's out of court statement used as evidence of a defendant's guilt falls with in a firmly rooted hearsay exception-- would prevail, he certainly is entitled to that approach. However, once this argument fails, respondent may not then call on the district court to entertain additional defenses. This attempt to strategically reserve defenses until they are necessary is precisely why courts have held that the state must assert harmless error at the outset or waive the defense entirely. *See e.g., Granberry v. Greer*, 481 U.S. 129, 132 (1987). This Court should not, as a matter of policy, encourage poorly planned lawyering or improper strategy, nor should  this Court to do the respondent's job for him by raising harmless error where he has failed to do so appropriately.   I find it troubling that the respondent has

---

[4]The respondent also argues that its waiver of harmless error issue should not be considered by this Court, as it is outside the scope of the District Court's certificate of appealability. This argument clearly lacks merit, as the propriety of considering harmless error is certainly part and parcel of Calvert's Confrontation Clause claim.

Bennett's grandson, Brian Bennett, testified that, when he visited his grandfather early on the evening of February 4, 1996, his grandfather was upset not only about having lost some money but also about Mallory's having threatened him with a butcher knife.   The grandson said that he had known Mallory for three or four months before his grandfather's death but had never met or seen Calvert.

Dr. Patrick Fardal testified that Bennett died as a result of multiple stab wounds to his trunk, chest and abdomen.   He did not die from trauma to the head.

## II.   THE PROCEEDINGS

The jury found Calvert guilty as charged.   The trial court followed the jury's recommendation and sentenced Calvert to life imprisonment, with parole eligibility after thirty full years, for the aggravated murder.    The judge sentenced Calvert to a consecutive term of ten to twenty-five years in prison for the aggravated robbery.

Calvert appealed his conviction to the Guernsey County Court of Appeals, arguing, among other things, that the trial court erred by allowing Mallory's tape-recorded statement into evidence, contrary to the Confrontation Clause of the Sixth Amendment to the United States Constitution.   The Guernsey County Court of Appeals affirmed Calvert's conviction, finding that Mallory's statement was properly admitted as a statement against the declarant's interest under Rule 804(b)(3) of the Ohio Rules of Evidence.  The appellate court also found that Mallory's statement "was collaborated [sic] by other evidence and witnesses" and was, therefore, trustworthy.  Calvert's appeal for discretionary review in the Ohio Supreme Court was dismissed on April 1, 1998, as not involving any substantial constitutional question.

On February 19, 1999, Calvert filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in federal district court.   He again raised the Confrontation Clause issue.   The district court found that the trial court's admission of Mallory's statement was error, constituting a violation of

Calvert's right to confront witnesses. Calvert was nonetheless denied relief because the district court found the error to be harmless. Calvert filed a timely notice of appeal, and the district court granted leave to proceed *in forma pauperis* and a certificate of appealability on the Confrontation Clause issue.

## III. STANDARD OF REVIEW

We review a district court's legal conclusions in a habeas proceeding *de novo* and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir.1999). Because Calvert's habeas petition was filed after April 24, 1996, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). As amended, AEDPA provides, in relevant part, that a federal court may not grant a petition for writ of habeas corpus unless the state court adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), the Supreme Court explained that a state court acts "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by this Court on a question of law" or if it "decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413 (Justice O'Connor's Part II majority opinion). The Court also explained that a state court's decision involves an "unreasonable application" of clearly established federal law if it either (1) correctly identifies the governing legal principle from the Supreme Court's decisions but then unreasonably applies that principle to the facts of the prisoner's case, or (2) unreasonably extends, or unreasonably declines to extend, a clearly established legal principle to a new context. Notably, an "unreasonable" application is an "objectively unreasonable" application. *Williams*, 529 U.S. at 412.

("arguments raised in passing in a footnote are waived.") This conclusion is logical, given that a footnote merely supplements an existing argument; it is not, by definition, used to present a new argument or idea. *See Webster's Third New International Dictionary for the English Language Unabridged* at 885 (Philip Babcock Gove, ed. 1993) (defining a footnote as "a note of reference, explanation, or comment placed below" and "an utterance or action that is subordinated or added to a larger statement or event"). While the respondent presumably would not expect a court to consider on the merits a defendant's footnotes containing simplistic legal conclusions, so too must he expect that similarly stated arguments by the respondent will likewise be considered waived.

It is worth noting that some federal appellate courts have held that even where the state waives the harmless error defense, a reviewing court has limited discretion to nonetheless conduct harmless error review. *See United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991) (holding that a court can determine if it possesses the requisite discretion to consider harmless error by considering "the length and complexity of the record, whether harmlessness of the error or errors is certain or debatable, and whether the reversal will result in protracted, costly, and ultimately futile proceedings in the district court"); *Horsley v. Alabama*, 45 F.3d 1486, 1492 n. 10 (11th Cir. 1995); *United States v. Langston*, 970 F.2d 692, 704 n.9 (10th Cir. 1992); *Lufkins v. Leapley*, 965 F.2d 1477, 1481 (8th Cir. 1992). These decisions are, of course, merely persuasive authority and are not binding on this Court. However, even if this panel were to subscribe to this analysis, we would be forced to conclude that we are without the discretion to consider harmless error, as the error here is not, as required by *Giovanetti*, plainly harmless. This defense was thus improperly considered by the district court and the majority opinion.

The respondent does not argue here that under the *Giovanetti* line of cases, this court may exercise its discretion

must present their cards at the outset; as matter of fundamental fairness and judicial economy, hidden hands should not be encouraged.

Here, in its Return of Writ, the respondent failed to raise the harmless error defense.[2] In a single footnote, without any recitation of legal standards or legal citations, the respondent mentioned that the "admission of [Mallory's statement] . . . if error at all, was harmless error in light of the other evidence admitted against Calvert." In the same footnote, the respondent recited three mostly unpersuasive facts that the prosecution presented at trial.[3] This footnote, without any further analysis, does not amount to an assertion of harmless error for the purposes of waiver. Indeed, it is generally held that an argument is not raised where it is simply noted in a footnote absent any recitation of legal standards or legal authority. *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999) ("We have repeatedly held that arguments raised in a footnote or in a perfunctory manner are waived."); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("[W]e have held that an argument made only in a footnote [is] inadequately raised for appellate review"); *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1076 (3d Cir.1997) (explaining that "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived"); *U.S. Dept. of Navy v. Fed. Labor Relations Auth.*, 975 F.2d 348, 352 (7th Cir. 1992)

---

[2] Notably, the respondent also did not raise harmless error before the Guernsey County Court of Appeals and, by extension, the Ohio Supreme Court, upon direct appeal.

[3] These were: (1) the fact that Calvert had Bennett's blood on his clothes and fingernails; (2) that Calvert uttered to Mallory in the presence of a cab driver, "we showed him;" and (3) Calvert told Crystal Harris that he hit an African-American man with a hatchet and did not know if he killed him. Calvert has consistently stated that he was present in Bennett's apartment when he was killed and was covered in Bennett's blood when he was arrested. Crystal Harris also testified that she did not think that Calvert was serious when he said that he hit someone with a hatchet; at any rate, Bennett was not African-American.

## IV.   PETITIONER'S SIXTH AMENDMENT CLAIM

### A.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has long held that a non-testifying co-defendant's statements that implicate a defendant are presumptively unreliable and their admission violates the Confrontation Clause. *Douglas v. Alabama*, 380 U. S. 415, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965). To overcome the presumption of unreliability, a prosecutor seeking admission of a non-testifying accomplice's statements that incriminate a defendant must demonstrate that the statements bear adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 63-66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). As explained by the Supreme Court:

> Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts*, 448 U.S. at 66.

In *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986), the Supreme Court considered the case of a woman, Millie Lee ("Lee"), who, in a bench trial, was found guilty of murder by a trial judge who expressly relied on a non-testifying co-defendant's confession implicating Lee. When questioned by police after her arrest, Lee said that she and her boyfriend, Edwin Thomas ("Thomas"), were arguing in the kitchen of the apartment that Lee shared with her aunt when a woman who was visiting the aunt entered the kitchen and chastised Lee and Thomas for arguing. Lee told police that (1) Thomas snapped, stabbing the woman in the back as she turned to leave the kitchen; (2) Lee then ran to the bedroom where she was threatened by her angry, knife-wielding aunt; and (3) Lee responded to her aunt's threats by

rushing back to the kitchen, grabbing a butcher knife, then returning to the bedroom where she repeatedly stabbed her aunt.

While Thomas corroborated many of the particulars of Lee's confession, he provided one significant detail in his confession that was conspicuously absent from Lee's account of the murders: he said that the murders were planned. According to Thomas, he and Lee formulated a preconceived plan to murder Lee's aunt in order to stop the aunt's harassment of Lee. Thomas explained that, when the presence of the aunt's friend threatened to disrupt their plans to kill the aunt, he and Lee devised a plan to kill the friend also.

In finding Lee guilty of the two murders, the trial court expressly relied on the version of events described by Thomas in his post-arrest confession. On appeal, Lee argued unsuccessfully that her Confrontation Clause rights were violated by the trial court's consideration of Thomas' confession against her. The Supreme Court reversed the appellate court's judgment affirming Lee's convictions, holding "that Thomas' statement, as the confession of an accomplice, was presumptively unreliable and that it did not bear sufficient independent 'indicia of reliability' to overcome that presumption." *Lee*, 476 U.S. at 539. The Court explained:

> As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another. If those portions of the codefendant's purportedly "interlocking" statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the

responsibility of ensuring that all claims in support of a petition for writ of habeas corpus are timely raised, so too does the warden bear the responsibility of ensuring all defenses, including harmless error, are timely raised. *See Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987) ("Respondent has made no attempt to argue that this error was harmless . . . [i]n the absence of such a showing our cases hold that the exclusion of mitigating evidence of the sort at issue here renders the death sentence invalid."); *United States v. Vallejo*, 237 F.3d 1008, 1026 (9th Cir. 2001) ("The Government does not argue that this error was harmless and thus waives that argument."); *Holland v. McGinnis*, 963 F.2d 1044, 1057 (7th Cir. 1992) ("Since Illinois did not argue harmless error in either of its briefs, it submitted [it] in a Rule 28(j) filing shortly after argument. The state's belated attempt to inject [the harmless error defense] at oral argument is both disturbing and unavailing."). *See also* Liebman & Hertz, Federal Habeas Corpus Practice and Procedure § 32.2a (3d ed. 1998) ("Like other defenses to habeas corpus relief, the "harmless error" obstacle does not arise unless the state asserts it; the state's failure to do so in a timely and unequivocal fashion waives the defense.") Indeed, for evident reasons, "[p]rocedural rules apply to the government as well as to defendants." *Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir. 1990). Just as a defendant may not "save" claims for strategic purposes, the state may not place the harmless error defense in an arsenal for safekeeping in the event that its substantive constitutional arguments fail. *See Yohn v. Love,* 887 F.Supp. 773, 792 (E.D. Pa. 1995), *aff'd in part, rev'd in part,* 76 F.3d 508 (3d Cir. 1996), quoting *Granberry v. Greer*, 481 U.S. 129, 132 (1987) (finding that the state must raise harmless error as an initial matter, such that it is prohibited from "seeking a favorable ruling on the merits while holding the defense in reserve for use after a finding of constitutional error."). *See also* Liebman & Hertz, § 32.2a. Both parties

---

has no merit, then the procedural health of the defense need not be examined, when in fact, particularly in the habeas context, a court is charged with determining the procedural integrity of a claim before making an inquiry as to its merits.

---
**CONCURRENCE**
---

R. GUY COLE, JR., Circuit Judge, concurring in the majority opinion. While I concur in the judgment of the majority, I write separately because I find problematic the fact that the majority has considered the harmless error defense where it has not been properly raised by the respondent.

I agree with the majority that the state may introduce statements considered hearsay as evidence of a defendant's culpability only where (1) the statements fall within a firmly rooted exception or (2) the statements contain particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything. *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980). Similarly, I do not dispute that the Supreme Court's Confrontation Clause jurisprudence dictates that, as a matter of clearly established law, an unavailable co-defendant's statements regarding the culpability of the defendant introduced by the prosecution to establish the defendant's guilt neither fall with a firmly rooted hearsay exception nor bear any indicia of reliability. *See Lilly v. Virginia*, 527 U.S. 116 (1999); *Gray v. Maryland*, 523 U.S. 185 (1998); *Williamson v. United States*, 512 U.S. 594 (1994); *Idaho v. Wright*, 497 U.S. 805 (1990); *Cruz v. New York*, 481 U.S. 186 (1987); *Lee v. Illinois*, 476 U.S. 530 (1986); *Bruton v. United States*, 391 U.S. 123 (1968).

While the district court correctly concluded that the inclusion of Erwin Mallory's confession violated Calvert's Sixth Amendment rights, that court also erred by considering the respondent's harmless error argument. The majority opinion propagates that error by considering the harmless error argument here on the merits.[1] While a petitioner has the

---

[1] The majority states that the waiver of harmless error argument is of no consequence because the error here is not harmless. That argument is backwards: the majority essentially concludes that because the defense

Sixth Amendment. In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted.

*Lee*, 476 U.S. at 545.

The Supreme Court in *Lee* did not expressly decide whether Thomas' confession fell within a firmly rooted hearsay exception. Indeed, not until 1999 did the Court specifically hold that "[a] statement...that falls into the category summarized in *Lee*--'a confession by an accomplice which incriminates a criminal defendant'...--does not come within a firmly rooted hearsay exception." *Lilly v. Virginia*, 527 U.S. 116, 134, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999) (quoting *Lee*, 476 U.S. at 544 n.5) (citation omitted). The Court made clear, however, that it was merely making explicit in *Lilly* what was implicit in earlier cases:

Our holdings in *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), *Cruz v. New York*, 481 U.S. 186, 107 S. Ct. 1714, 95 L. Ed. 2d 162 (1987), *Gray v. Maryland*, 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998), and *Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986), were all premised, explicitly or implicitly, on the principle that accomplice confessions that inculpate a criminal defendant are not per se admissible (and thus necessarily fall outside a firmly rooted hearsay exception), no matter how much those statements also incriminate the accomplice. If "genuinely" or "equally" inculpatory confessions of accomplices were...per se admissible against criminal defendants, then the confessions in each of those cases would have been admissible, for each confession inculpated the accomplice equally in the crimes at issue. But the Court in *Lee* rejected the dissent's position that a nontestifying accomplice's confessions that are "unambiguously" against the accomplice's penal interest are per se admissible,...and we ruled in *Bruton*, *Cruz*, and *Gray* that such equally

self-inculpatory statements are inadmissible against criminal defendants. Today we merely reaffirm these holdings and make explicit what was heretofore implicit.

*Lilly*, 527 U.S. at 134 n.5.

The defendant in *Lilly*, Benjamin Lee Lilly ("Lilly"), was convicted of murder and other crimes after the trial court admitted statements made by an accomplice under police questioning. The accomplice, who at trial invoked his Fifth Amendment privilege against self-incrimination, admitted to police that he was a participant in the crime spree that ended with the murder of a man, but he denied responsibility for the murder. He said that Lilly shot the victim. The trial court admitted the accomplice's statements as declarations of an unavailable witness against penal interest, overruling Lilly's objections that admission of the statements would violate his Confrontation Clause rights. In affirming Lilly's convictions, the Virginia Supreme Court found that the Confrontation Clause was satisfied because the accomplice's statements fell within a firmly rooted exception to the hearsay rule under Virginia law, because the accomplice implicated himself as a participant in numerous crimes, and because the statements were independently corroborated by other evidence at trial. The Supreme Court reversed, rejecting all bases for the Virginia Supreme Court's decision.

The *Lilly* Court first said that it was irrelevant that all statements against penal interest of an unavailable witness were treated as firmly rooted exceptions to the hearsay rule under Virginia law. Explaining that the question whether statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes is a question of federal law, the Court held: "The decisive fact, which we make explicit today, is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Lilly*, 527 U.S. at 134. The Court recognized, of course, that even though the confession in *Lilly* did not fall within a firmly rooted hearsay

emphasized that confessions which expressly implicate a defendant are "powerfully incriminating." Indeed, specific testimony that "the defendant helped me plan and commit the crime" is much more vivid than any evidence that is incriminating only when the jury makes an inference. In this case, without Mallory's statement, the jury would have had to infer Calvert's guilt. With the admission of Mallory's statement, the jury had no need to engage in any inferences at all. *See Bulls v. Jones*, No. 00-1289, 2001 WL 1456335, at *5 (6th Cir. Nov. 19, 2001) (holding that admission of non-testifying co-defendant's statement, which provided direct evidence--the only direct evidence--of malice, had substantial and injurious effect in determining jury's verdict).

In this case, Mallory's statement may have been precisely the evidence that convinced the jury that Calvert "purposely, and with prior calculation and design," caused the death of Bennett. We must conclude, therefore, that the admission of Mallory's statement had a substantial and injurious influence in determining the jury's verdict. Accordingly, we REVERSE the district court's denial of habeas relief and REMAND with directions to issue a conditional writ of habeas corpus releasing Calvert from custody, unless he is retried within a reasonable period of time to be determined by the district court.

Calvert and Mallory took a cab to a bar not long after Calvert left Bennett's apartment; that Calvert returned to Bennett's neighbor's apartment the next morning still dressed in the clothes he was wearing the night before; that his clothes were stained with Bennett's blood; that traces of Bennett's blood type were found in nail scrapings from Calvert's left-hand; and that Calvert was cooperative when police officers found him in Bennett's neighbor's apartment the morning after the murder. In addition, the jury apparently heard from the cab driver that Calvert, who was in good spirits during the cab ride to the bar, said to Mallory: "We showed him." The jury also apparently heard that, late on the evening of the murder, Calvert told a friend that he had hit a black man (Bennett was white) with a hatchet but did not know if the man was dead.[2] The jury did not hear, from anyone but Mallory, that Calvert caused the death of Bennett with prior calculation and design.

Defense counsel argued to the jury that Mallory severely wounded Bennett in Calvert's presence, leaving traces of blood on his clothes and his hand; that Calvert "got out" while Bennett was still alive; that Mallory left the bar early and later, dressed in his pajamas, returned to Bennett's apartment, broke open the window to unlock the door, and finished off Bennett by stabbing him repeatedly with a knife. Had Mallory's statement not been admitted, the evidence against Calvert was circumstantial and not inconsistent with Calvert's argument that he was present when Bennett was initially wounded but was not present when Bennett was later killed. Had Mallory's statement not been admitted, the prosecutor had no direct evidence that Calvert acted with prior calculation and design.

In *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the Supreme Court

---

[2]In its order denying habeas relief to Calvert, the district court mentioned, citing to the appropriate pages in the trial transcript, the testimony of the cab driver and the friend who heard Calvert boasting about hitting a black man; however, those pages of the trial record are not contained in the record before this court.

exception, the confession might nonetheless have been admissible if it had been supported by a showing of particularized guarantees of trustworthiness.

The Supreme Court went on, however, to discredit the purported guarantees of trustworthiness upon which the state courts relied in Lilly's case. The Court, for example, rejected the notion that corroborative evidence provides the "particularized guarantees of trustworthiness" needed to support admission of an accomplice's confession. Citing its 1990 decision in *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), the Court noted that it had squarely rejected the argument that evidence corroborating the truth of a hearsay statement may support a finding that the statement bears "particularized guarantees of trustworthiness." *Lilly*, 527 U.S. at 138-139. In *Wright*, 497 U.S. at 822, the Court had said that "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial."

The Supreme Court also rejected the notion that a self-inculpatory confession is trustworthy. Quoting its 1994 decision in *Williamson v. United States*, 512 U.S. 594, 599, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994) (holding--without reaching the Confrontation Clause issue--that an accomplice's statement against his own penal interest was inadmissible against the defendant under the Federal Rules of Evidence), the Court wrote: "[T]hat a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Lilly* 527 U. S. at 139. Noting the presumptive unreliability of the "non-self-inculpatory" portions of an accomplice's statement, the Court wrote, again quoting *Williamson*, 512 U.S. at 599-600: "One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Lilly*, 527 U.S. at 133.

Unpersuaded that the accomplice's confession in *Lilly* was trustworthy either because it was self-incriminating or because it was supported by other corroborative evidence, the Supreme Court suggested that the circumstances relevant to the trustworthiness inquiry are those that surround the making of an accomplice's statement. The Court noted that "the historical underpinnings of the Confrontation Clause and the sweep of our prior confrontation cases offer one cogent reminder: It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice--that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." *Lilly*, 527 U.S. at 137. Applying the "historical underpinnings" to the confession at issue in *Lilly*, the Court concluded:

> [The accomplice] was in custody for his involvement in, and knowledge of, serious crimes and made his statements under the supervision of governmental authorities. He was primarily responding to the officers' leading questions, which were asked without any contemporaneous cross-examination by adverse parties. Thus, [the accomplice] had a natural motive to attempt to exculpate himself as much as possible.

*Lilly*, 527 U.S. at 139. Under these circumstances, the Court found that admission of the co-defendant's confession violated Lilly's Confrontation Clause rights.

### B.

In this case, the Guernsey County Court of Appeals rejected Calvert's Confrontation Clause claim in a brief opinion that provides little analysis of federal law. The appellate court began its Confrontation Clause analysis by stating that the standard for admission of Mallory's confession was governed by the Ohio evidentiary rule governing statements against interest and by a decision of the Ohio Supreme Court, *State v.*

requirement of "prior calculation and design." The Ohio Jury Instructions define "prior calculation and design" as follows:

> "Prior calculation and design" means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means and/or instrument with which to cause the death.
>
> To constitute prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

4 Ohio Jury Instructions § 503.01; *see also State v. Coley*, 754 N.E.2d 1129 (Ohio 2001) (finding no merit to the defendant's challenge to the trial court's jury instruction--the pattern instruction from the Ohio Jury Instructions--defining "prior calculation and design").

Our review of the evidence convinces us that Mallory's tape-recorded confession was the most compelling piece of evidence against Calvert. Without Mallory's statement, the jury heard that Mallory, not Calvert, threatened Bennett with an ax the evening before Bennett was murdered; that Bennett's grandson saw that his grandfather was upset and concerned about Mallory's threats just hours before the murder; that Calvert knew nothing about any plan to kill Bennett when he agreed to accompany Mallory to Bennett's apartment; that, within minutes of entering Bennett's apartment, Mallory bludgeoned Bennett with a hatchet and cut him across the throat with a butcher knife; that Calvert, who was near Bennett at the time, "got out" when the blood started flying; that Bennett was still alive when Calvert left the scene; that Mallory disposed of the murder weapons; that

determining harmless error, the district court nonetheless turned to a pre-*Brecht* case for a list of factors to be considered in making the harmless error assessment. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).   In *Van Arsdall*, in a Confrontation Clause context, the Court held:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.   These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684.

While acknowledging the *Brecht* standard, the district court considered the factors that the Court in *Van Arsdall* said should be considered in making the *Chapman* harmless-beyond-a-reasonable-doubt assessment.  The district court's discussion of the harmless error issue thus centered on the "significant evidence" against Calvert.  The district court said nothing in its order about the effect of the Confrontation Clause error on the jury.

To prove aggravated murder under Ohio law, a prosecutor must prove, beyond a reasonable doubt, that a defendant "purposely, and with prior calculation and design, cause[d] the death of another."   Ohio Rev. Code 2903.01(A).  "Prior calculation and design" became an element in 1974 when the Ohio General Assembly reclassified first-degree murder as "aggravated murder" and replaced the more traditional element of "deliberate and premeditated malice" with the

*Gilliam*, 635 N.E.2d 1242 (Ohio 1994), *cert. denied*, 513 U.S. 1090, 115 S. Ct. 750, 130 L. Ed. 2d 650 (1995).  In *Gilliam*, the Ohio Supreme Court found that the admission of a non-testifying accomplice's self-incriminating statement, which was corroborated by other witnesses, did not offend the Sixth Amendment's Confrontation Clause because "the evidence was admissible pursuant to a firmly rooted exception to the hearsay rule" and because the self-inculpatory nature of the statement, coupled with other corroborative evidence, provided guarantees of trustworthiness. *Gilliam*, 635 N.E.2d at 1246.  Convinced that the facts in *Gilliam* were "identical" to the facts in Calvert's case, the Guernsey County Court of Appeals determined that the admission of Mallory's confession against Calvert was proper.   The court wrote:

> Mr. Mallory admitted to hitting the victim with a stick and stabbing the victim...Mr. Mallory concluded his statement by stating: "I'm guilty. I'm guilty. Guilty of murder."  We find Mr. Mallory's statement was against his interest and clearly subjected him to "criminal liability."  Mr. Mallory's statement demonstrated first hand knowledge of the incident...

> In examining Mr. Mallory's statement for trustworthiness, we find the trial court had previously ruled after a suppression hearing that Mr. Mallory's statement was admissible against Mr. Mallory...Mr. Mallory's description of the evening's activities was collaborated [sic] by other evidence and witnesses.  Mr. Mallory's pajamas were found to be bloodstained by the Bureau of Criminal Identification and Investigation; three of the knives were found where Mr. Mallory said they would be and a broken walking stick was found in the victim's apartment.

> Upon review, we find the trial court properly applied the *Gilliam* case and properly permitted the playing of Mr. Mallory's taped statement.

Conspicuously absent from the Guernsey County court's opinion was discussion and/or analysis of federal law, most

notably the *Lee v. Illinois* decision. Under strikingly similar circumstances, the court in *Gilliam* and the Supreme Court in *Lee* had reached different conclusions regarding Confrontation Clause error. In both cases, the trial court admitted the confession of a non-testifying accomplice who under post-arrest police questioning admitted his guilt, who demonstrated first hand knowledge of the crimes, and whose testimony was corroborated by other evidence and witnesses. Whereas the *Gilliam* court found no Confrontation Clause error under these circumstances, the Supreme Court held that "on the record before us, there is no occasion to depart from the time-honored teaching that a codefendant's confession inculpating the accused is inherently unreliable, and that convictions supported by such evidence violate the constitutional right of confrontation." *Lee*, 476 U.S. at 546.

In reviewing Calvert's habeas petition, the district court correctly concluded that, under federal law, the admissibility of Mallory's statement depended upon what, if any, particularized guarantees of trustworthiness surrounded the making of the statement. Contrary to the state courts, the district court found no such guarantees surrounding the statement made by Mallory. Like the accomplice's statement in *Lee*, Mallory's statement was the product of in-custody interrogation for his involvement in, and knowledge of, serious crimes. Like the accomplice in *Lee*, Mallory made his statements under the supervision of governmental authorities, in response to police officers' leading questions, which were asked without any contemporaneous cross-examination by adverse parties. Under these circumstances, the district court determined that there were no circumstantial guarantees of trustworthiness which would remove the presumption of unreliability and that, therefore, the admission of Mallory's statement was a violation of the Confrontation Clause.

We have no trouble in concluding that the district court correctly determined that the admission of Mallory's tape-recorded statement against Calvert violated Calvert's Confrontation Clause rights. We also have no trouble in concluding that the Ohio courts acted "contrary to" clearly

established Supreme Court precedent when they determined that the admission of Mallory's statement did *not* violate the Confrontation Clause. We reject Respondent's suggestion that the relevant law did not become clear until 1999, when, after Calvert's appeal was decided, the Supreme Court decided in *Lilly* that statements against penal interests do not fall within a firmly rooted hearsay exception. At the time of Calvert's trial, federal constitutional law, as clearly established by the Supreme Court in such cases as *Lee v. Illinois* and *Idaho v. Wright*, mandated the exclusion of Mallory's tape-recorded confession as evidence against Calvert. The Ohio courts' decisions to the contrary constituted error under the Confrontation Clause.

### C.

Despite having found a Confrontation Clause violation, the district court denied relief because it found the error to be harmless.[1] This court reviews a district court's decision as to harmless error *de novo*.

For purposes of federal habeas corpus review, a constitutional error that implicates trial procedures is considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). This standard of review requires the reviewing court to examine the effect of the error on the jury rather than the sufficiency of the evidence at trial.

Before *Brecht*, courts had applied the harmless-beyond-a-reasonable-doubt standard enunciated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Acknowledging that *Brecht* set the standard for

---

[1] Calvert argues that Respondent waived the harmless error issue by raising it in a footnote without discussion or citation to authority. Because we find that Calvert is entitled to relief whether Respondent waived the harmless error issue or not, we decline to consider Calvert's argument regarding waiver.